IDA F. POLLACK [IRVING GERSTMAN, ADMINISTRATOR, SUBSTITUTED PLAINTIFF] *v.* HARRY A. GAMPEL ET AL.

HOUSE, C. J., RYAN, SHAPIRO, LOISELLE and MACDONALD, JS.

Argued June 13—decided July 27, 1972

*James F. Kenny,* with whom, on the brief, was *James P. White, Jr.,* for the appellants (named defendant et al.).

*Lawrence P. Weisman,* with whom was *Richard L. Albrecht,* for the appellee (plaintiff).

RYAN, J. This action was brought by Ida F. Pollack seeking damages for personal injuries from the defendants Harry A. Gampel, Frank Beckerman and Monty Casden, doing business as G. B. C. Realty Company, a copartnership with a place of business in the city of Hartford, Mildred S. Higgins, Inc., and Mildred S. Higgins Rental Corporation, Connecticut corporations with offices in Bridgeport and New Haven. Casden was later dropped as a party defendant. The first two counts of the complaint sound in negligence and the third count is predicated on a breach of contract. A third-party complaint was brought by the defendants Gampel and Beckerman against Harmont Building Corporation, Norkin Plumbing Company, Inc., and G & N Mechanical Corporation. The disposition of the

action against the third-party defendants was severed by the trial court pending the conclusion of the original action and we are not concerned with it in this appeal.

Following a trial to the jury a verdict was returned for the plaintiff to recover $65,000 from the defendants Gampel and Beckerman, doing business as G. B. C. Realty Company on the negligence counts. The jury found the issues for the defendant Mildred S. Higgins, Inc.[1] Following the denial by the trial court of the defendants' motion to set aside the verdict and for judgment notwithstanding the verdict, the defendants have appealed from the judgment rendered thereon. The original plaintiff Ida F. Pollack died after the trial and her administrator was substituted as a party plaintiff. For clarity we shall refer to the deceased as the plaintiff.

In the complaint, the plaintiff alleged that on March 28, 1967, she suffered serious personal injuries including heart damage and burns on her feet as a result of a flood of hot water in her apartment, which was caused by defective bathroom plumbing. She occupied the apartment owned by the defendants Gampel and Beckerman under a lease and re-rental contract dated August 17, 1966. The complaint alleged negligence on the part of the defendants in the construction and maintenance of the plumbing equipment and in their failure properly to inspect this equipment.

The defendants assign error in the refusal of the trial court to set aside the verdict on the ground that it was not supported by the evidence and in

[1] The verdict did not mention the defendant Mildred S. Higgins Rental Corporation. While the record indicates no reason for this, we must assume that this corporation was not a party to the action at the time of the verdict.

denying their motion for judgment notwithstanding the verdict. These rulings are tested by the evidence printed in the appendices to the briefs. *Kirby* v. *Zlotnick,* 160 Conn. 341, 342, 278 A.2d 822; *Kelly* v. *Bliss,* 160 Conn. 128, 130, 273 A.2d 873; *Petrizzo* v. *Commercial Contractors Corporation,* 152 Conn. 491, 498, 208 A.2d 748. We view this evidence in the light most favorable to sustaining the verdict. *Bartholomew* v. *Catania,* 161 Conn. 130, 132, 285 A.2d 350; *Amato* v. *Sawicki,* 159 Conn. 490, 492, 271 A.2d 80.

On the issue of liability the jury reasonably could have found the following facts: In December, 1964, the defendants Gampel and Beckerman, together with Monty Casden, who was subsequently dropped as a party defendant, formed a partnership, called G. B. C. Realty Company, for the purpose of constructing an apartment building and holding it for investment. In August, 1966, the plaintiff Ida Pollack entered into a lease with the realty company for apartment 1-R in the apartment house being constructed by the partnership in the city of Bridgeport. The lease provided that the landlord was responsible for building maintenance and also that the landlord should be permitted to enter the apartment during reasonable hours to inspect or make necessary repairs. On November 1, 1966, the plaintiff moved into the apartment.

Two months thereafter, the plaintiff heard rumbling and vibrating noises in the wall between her bathroom and the clothes closet. She frequently complained about this situation to the building manager but he never came to her apartment. One month later, the sound in the wall changed from a rumbling, vibrating noise to a sizzling noise like that of a boiling tea kettle. The plaintiff continued to make

complaints to the manager and also complained to the building superintendent. After she had complained to the superintendent he visited her apartment once or twice and he heard rumbling and vibrating noises and noticed that the apartment was very hot. He assumed the noises came from the boiler room which was located directly beneath the apartment, yet at no time while he was in the apartment did he leave the living room, enter the bathroom or turn on the water. He did nothing about the plaintiff's complaint except to refer it to the rental manager and to the defendants.

On March 28, 1967, the plaintiff awakened about 3 a.m. Her room was full of steam and she experienced difficulty in breathing. Since she was unable to get help on the telephone, she got out of bed, stepped into ankle-deep hot water which flooded her room, and ran out of the apartment. As a result of this she suffered first- and second-degree burns on her feet and toes and the experience resulted in some heart damage. The hot water came from a hot water branch pipe, which fed the plaintiff's bathroom basin. This had separated from a T-joint fitting which connected that portion of the branch line coming from the building's main vertical supply line to that portion of the branch line which led to the plaintiff's washbasin in her bathroom. This separation, from which hot water was still gushing five hours after the plaintiff left the apartment, was the source of the flood. None of these pipes was visible from the apartment; they were concealed behind a sheetrock wall which had to be broken through in order to reach the plumbing for repair. The separated pipes had originally been unified by sweat-fitting and soldering in accordance with standard plumbing procedure. A person observing connected

pipes which had been fitted and unified in this manner would not, from their outside appearance, be able to detect anything wrong with the joint.

Connecticut subscribes to the common-law view that a landlord is under no obligation or liability to the tenant for personal injuries due to the defective condition of the demised premises or the lack of repair of defects therein in the absence of an agreement, express or implied to the contrary. *Panaroni* v. *Johnson,* 158 Conn. 92, 97, 256 A.2d 246; *Pignatario* v. *Meyers,* 100 Conn. 234, 237, 123 A. 263. One of the many exceptions to this rule, however, is where the landlord retains control of a portion of the demised premises. In such a case the landlord must use reasonable care to keep that portion of the premises in a reasonably safe condition. *Panaroni* v. *Johnson,* supra, 98; *Douglass* v. *95 Pearl Street Corporation,* 157 Conn. 73, 82, 245 A.2d 129; *Masterson* v. *Atherton,* 149 Conn. 302, 179 A.2d 592. In order to demonstrate a breach of this duty the plaintiff must show that the defendants had actual knowledge of the defect or that they were chargeable with constructive notice of it, because, had they exercised a reasonable inspection of the premises, they would have discovered it. *Kirby* v. *Zlotnick,* supra, 344.

During oral argument before this court, the defendants conceded that there was sufficient evidence to support a finding by the jury that the defendants had control of the defective plumbing. The plaintiffs make no claim of actual notice of a defect. Hence, the primary issue relative to liability is whether the defendants had constructive notice of the defect. We must decide whether the jury reasonably could conclude from the evidence that the defendants, in the exercise of a reasonable inspection, would have discovered that the hot water branch pipe

and the T-joint were defectively connected. The defendants contend that there was no evidence from which the jury could so conclude.

There was evidence from which the jury could have found that the defendants' agents failed to make a reasonable inspection of that part of the premises which was defective and it is therefore no defense that no defect was in fact discovered prior to the accident. The defendants rely heavily on the fact that visual inspection of a sweat-fitted and soldered connection of pipes would reveal no defect in the connection, but it is well established that visual observation alone does not amount to a reasonable inspection. *Long* v. *Savin Rock Amusement Co.,* 141 Conn. 150, 152, 104 A.2d 221; *Klahr* v. *Kostopoulos,* 138 Conn. 653, 656, 88 A.2d 332. It is true that, to charge the defendants with liability, the notice must have been of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect and subsequently in fact producing it. The greater the likelihood of danger, however, the greater is the amount of care required in making an inspection of premises to meet the standard of due care. *DeSantis* v. *New England Furniture Co.,* 132 Conn. 134, 138, 42 A.2d 792. The controlling question in deciding whether the defendant had constructive notice of the defective condition is whether the condition had existed for such a length of time that the defendants' employees should, in the exercise of due care, have discovered it in time to have remedied it. *Morris* v. *King Cole Stores, Inc.,* 132 Conn. 489, 492, 45 A.2d 710. What constitutes a reasonable length of time within which the defendant should have learned of the defect, how that knowledge should have been acquired, and the time within which, thereafter, the

defect should have been remedied are matters to be determined in light of the particular circumstances of each case. The nature of the business and the location of the defective condition would be factors in this determination. To a considerable degree each case must be decided on its own circumstances. In the case before us, the defendants were alerted to a possible defect by the plaintiff's complaints of a sizzling noise in the wall between the bathroom and the clothes closet. The defendants' agent's inspection consisted of a brief conversation with the plaintiff in her living room; he never entered either the bathroom or the clothes closet where he could have listened more closely and carefully for the sounds of which she had complained. This falls far short of the required inspection.

The insufficient inspection alone would not render the defendants liable. It was incumbent on the plaintiff to offer evidence from which the jury reasonably could have concluded that a reasonable inspection would have disclosed the plumbing defect. The evidence indicates that there was a sizzling noise, like that of a boiling tea kettle, emanating from behind the wall of the plaintiff's bathroom. In reaching its conclusions, the jury may ascribe to the parties matters of common knowledge; *Long* v. *Savin Rock Amusement Co.,* supra, 155; *Clark* v. *George B. Wuestefeld Co.,* 132 Conn. 653, 656, 46 A.2d 841; and by knowledge common to men in general and to a man in charge of an apartment building's maintenance in particular, the sizzling noise described by the plaintiff is indicative of escaping steam. Escaping steam in an area of water pipes implies, in turn, that there is a leak in the pipes. The jury, therefore, could reasonably find that had the building superintendent entered the bathroom and

heard the sizzling noise, due care required that he investigate the abnormality further. We cannot say that the jury could not reasonably have concluded that, had the pipes been exposed on further investigation, steam would have been seen by a discerning eye or a stream of hot air from the joint felt by an inquisitive hand, thus revealing a leak, and the defectively-connected pipes which eventually caused the accident. A month had passed between the time the sizzling noise began and the time of the accident. The defendants, therefore, had ample time to inspect and discover the defect. The jury could have concluded that the defendants had constructive notice of the defect, and the trial court properly refused to set aside the verdict on this ground.

We are mindful of the principle that a landlord cannot be held liable for injuries resulting from a defect where he knew only of conditions naturally productive of the defect, but did not know of the defect itself. *Kirby* v. *Zlotnick,* 160 Conn. 341, 344, 278 A.2d 822; *Fogarty* v. *M. J. Beuchler & Son, Inc.,* 124 Conn. 325, 329, 199 A. 550. The case before us, however, is distinguishable from cases where that principle operated to protect the landlord, because here the steam leak, which the jury could have believed existed from evidence of the sizzling noise, was itself a product of the defect rather than a condition naturally productive of it. It therefore constituted knowledge not of a condition productive of the defect, but of the defect itself.

One of the specifications of negligence in the plaintiff's complaint was an allegation that the defendants violated § H-2-6n of the Bridgeport housing code. The defendants requested the court to instruct the jury that this section had no application to the present case, but the court denied the request

and charged on the ordinance. The defendants have assigned error in the court's refusal to charge as requested.

Section H-2-6n provides that "[t]he plumbing system shall be subjected to a water or air pressure test and to a final air pressure, smoke or peppermint test in such a manner as to disclose all leaks and imperfections in the work." There was evidence that the only pressure test of the plumbing done in the construction of the building was when the main plumbing line was turned on and all the risers were filled to the top. The defendants urge that this section falls within that portion of the housing code entitled "Minimum Requirements for Drainage & Toilet Systems" and argue that since the plumbing involved in this case was the hot water supply system, the ordinance is inapposite. There is no merit in this argument. Titles are of little importance as compared with the text to indicate legislative intent. Where language of the ordinance is plain a title cannot restrict its meaning. *Algonquin Gas Transmission Co.* v. *Zoning Board of Appeals,* 162 Conn. 50, 55, 291 A.2d 204; *Mad River Co.* v. *Wolcott,* 137 Conn. 680, 688, 81 A.2d 119. Here, the language of the section is clear and unambiguous. It refers to plumbing systems generally and is not confined to any particular components thereof. It is axiomatic that words of an ordinance are to be interpreted in their natural and usual meaning. *Lawrence* v. *Zoning Board of Appeals,* 158 Conn. 509, 511, 264 A.2d 552. Plumbing refers to the pipes, fixtures and other apparatus concerned in the introduction, distribution and disposal of water in a building. Webster, Third New International Dictionary. Obviously, the hot water supply system is part of the plumbing system. Moreover, it is reveal-

ing to note that while § H-2-6n appears in a section entitled "Minimum Requirements for Drainage & Toilet Systems," there are other subsections thereunder which pertain to subjects beyond the purview of the title. Section H-2-6d states that "[d]evices for heating water and storing it in hot water tanks shall be so designed and installed as to prevent all dangers from explosion." Section H-2-6u deals with drinking fountains, while § H-2-6v provides that plumbing systems shall be maintained in a sanitary condition. The request to charge was inconsistent with law and therefore was properly refused. *Ferreira* v. *Storms,* 159 Conn. 259, 261, 268 A.2d 657; *Bernard* v. *Ribner,* 151 Conn. 670, 673, 201 A.2d 658.

The defendants also claim that the court erred in charging the jury on the doctrine of res ipsa loquitur. "We have frequently stated the three conditions under which the doctrine might apply: (1) The situation, condition, or apparatus causing the injury must be such that in the ordinary course of events no injury would result unless from a careless construction, inspection or user. (2) Both inspection and user must have been at the time of the injury in the control of the party charged with neglect. (3) The injurious occurrence or condition must have happened irrespective of any voluntary action at the time by the party injured. *Briganti* v. *Connecticut Co.,* . . . [119 Conn. 316, 320, 175 A. 679]." *Schurgast* v. *Schumann,* 156 Conn. 471, 479, 242 A.2d 695. The defendants contend that there was no evidence to show that the user was in their control at the time of the injuries. We test the charge by the claims of proof as they appear in the finding. *DePaola* v. *Seamour,* 163 Conn. 246, 249, 303 A.2d 737; *Intelisano* v. *Greenwell,* 155 Conn. 436, 444, 232 A.2d

490. The claims of proof, which have not been attacked, amply justify the giving of the charge in the present case. The plaintiff offered evidence to prove and claimed to have proved that the lease obligated the landlord to supply hot and cold running water; that the landlord was responsible for building maintenance; and that the landlord was permitted to enter the plaintiff's apartment to inspect. The term "user" implies the idea of management and control as well as actual use. *Bluett* v. *Eli Skating Club,* 133 Conn. 99, 103, 48 A.2d 557. Clearly, the defendants were managing and had control of the plumbing involved here and were actually using the pipes to satisfy their duty of supplying hot water to the plaintiff.

In their brief the defendants make the further argument that the court should not have instructed the jury on the doctrine of res ipsa loquitur because the plaintiff offered evidence of specific acts of negligence on the part of the defendants which, if believed, would support a finding by the jury that such negligence was the proximate cause of the plaintiff's injuries. In the recent case of *Queen* v. *Gagliola,* 162 Conn. 164, 170, 292 A.2d 890, we said that where there is evidence of specific negligence on the part of the defendant which will support a finding by the jury that such negligence was the proximate cause of the plaintiff's injuries, the jury should not be instructed on the doctrine of res ipsa loquitur and that it was error for the court in such a situation to charge on the doctrine. The defendants' failure, however, to raise this point at the trial by appropriate exception to the charge precludes our review of the claim on appeal. *State* v. *Hawkins,* 162 Conn. 514, 517, 294 A.2d 584.

During the course of the plaintiff's case there was

offered in evidence a so-called participation agreement involving the defendants Gampel and Beckerman and others, a document of some fifteen pages, embracing all the details of a joint venture concerning the property in question and changing the ownership of the property. The plaintiff claimed that the document was admissible because one paragraph of it showed a continuing responsibility of management by the owners of the building. The plaintiff further claimed that the whole document was admissible because the other parts of the document should not be severed, since in doing so the true import of the document would be destroyed. The defendants objected to the admission of the document other than that one paragraph because all the other parts were irrelevant and prejudicial and because it dealt with the fiscal and financial arrangements between the signatories to the document which were not in issue and because the document would have a tendency to be prejudicial to the defendants. The court admitted the entire document as a full exhibit and exception was properly taken by the defendants. The admissibility of this document rested on the discretion of the trial judge. Under the circumstances we cannot say that prejudicial error was committed.

Turning now to the question of damages, the defendants have conceded in their brief that the plaintiff, who was sixty-five years of age at the time of the accident, suffered first- and second-degree burns of the feet, as well as a subendocardial or myocardial infarction of the heart with anginal pains. They claim, however, that there was no evidence of causation which would warrant the consideration by the jury of an injury which the plaintiff claimed to have suffered to the left bundle branch

nerves in the heart. Specifically, the defendants attack the court's charge to the jury on this issue and the court's inclusion in the finding of the claims of proof which would support this charge. Further, they contend that the verdict of $65,000 is excessive to the extent that it reflects an award for this claimed injury and that the court erred in refusing to set it aside.

The evidence as printed in the appendices to the briefs, viewed in the light most favorable to the plaintiff, fails to disclose evidence which would link the left bundle branch injury to the defendants' negligence. The plaintiff's physician, Henry J. Messenger, testified that he had treated the plaintiff prior to the accident for intervals of hypertension, hypertensive cardiovascular disease, diabetes and arteriosclerosis, but said that the plaintiff never had a heart attack prior to the accident. After the accident, she was admitted to St. Vincent's Hospital where an electrocardiogram was taken. This revealed a recent subendocardial infarction or myocardial infarction, commonly known as a heart attack. Messenger stated that this heart attack was brought on by stress from the shock and excitement of the accident. When the heart attack was discovered, Messenger requested Irwin Eskwith, the chief of cardiology at St. Vincent's Hospital, to examine the plaintiff. He reviewed the electrocardiogram and determined that there was a subendocardial or myocardial infarction, which is an area of dead tissue in the front wall of the heart extending through part of the muscle thickness of the heart. He testified that it was reasonably probable that this injury occurred at the time, or shortly after the time, when the plaintiff stepped in the scalding water, and that it was a reaction to the

burning she suffered to her feet. On June 20, 1967, Eskwith saw the plaintiff in his office and took a cardiogram which showed a healed anterior myocardial infarction. The next time he saw the plaintiff was on October 12, 1967. At that time, he took an electrocardiogram which showed that the normal rhythm was not spreading through the heart properly. There was damage to one of the nerve fibers that runs through the heart and makes the heart contract in an orderly manner. This condition is called a left bundle branch block. The nerves reaching the heart come in two bundles, a right and a left. Her left bundle was injured which means that the heart was not contracting as efficiently as it should.

The testimony is singularly devoid of anything which would indicate that either physician believed that the injury to the left bundle branch was proximately caused by the accident of March 28, 1967. The defendants' expert, Wallace Lebowitz, a physician, testified that "left bundle branch refers to further progression, which was silent, and there is no way of telling when these things occur." This is not an assertion that with reasonable medical probability the injury in question was caused by the defendants' negligence. Such testimony is patently insufficient to permit the jury to infer the requisite causation. The issue should not have been submitted to the jury.

It is clear that without the item of damages for the injury to the left bundle branch, the verdict was excessive. The plaintiff incurred about $4000 in medical and hospital expenses and a little over $1000 in property damage. The myocardial infarction had healed. The left bundle branch block was by far the most serious of the injuries she claimed she had suffered. Eskwith testified that

the appearance of this malady after a myocardial infarction is a very serious sign and in general, people who have suffered from this will live about five years after the appearance of the bundle branch block and this is more probable as people advance in years. A verdict of a jury cannot prevail if it is unsupported by the evidence. *Bartholomew* v. *Catania,* 161 Conn. 130, 134, 285 A.2d 350. There can be no doubt that a significant portion of the jury's verdict represents compensation for this condition.

It is unnecessary to discuss the remaining assignments of error.

There is error, the judgment is set aside and a new trial is ordered solely on the issue of damages.

In this opinion the other judges concurred.