EDWARD CONSIDINE *v.* CITY OF WATERBURY
(SC 17551)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

. . . ."

Argued February 16—officially released September 12, 2006

*Paula N. Anthony*, for the appellant (defendant).

*James P. Brennan*, for the appellee (plaintiff).

*Opinion*

VERTEFEUILLE, J. The defendant, the city of Waterbury, appeals from the judgment of the trial court rendered in favor of the plaintiff, Edward Considine. The defendant contends that the trial court improperly determined that governmental immunity as set forth in General Statutes § 52-557n[1] did not shield it from liability and that the plaintiff had proffered sufficient evidence to establish that the defendant was negligent in maintaining its property. We disagree, and, accordingly, we affirm the judgment of the trial court.

---

[1] General Statutes § 52-557n (a) provides in relevant part: "(1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by . . . (B) negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit . . . (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by . . . (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law."

The trial court found the following pertinent facts. For many years, the defendant has owned and operated a public municipal golf course known as Western Hills Golf Course. A clubhouse building located on the course property contains a pro shop, locker rooms, restrooms and a restaurant called The Hills Restaurant (restaurant). On or about March 1, 2002, the plaintiff and two friends went to the restaurant to listen to guitarists who were performing there that night. The restaurant is a private establishment that serves meals and alcohol and provides entertainment for its customers. The defendant leases a portion of the clubhouse to the restaurant and under the terms of the lease, the defendant is responsible for maintaining the common areas of the clubhouse that permit access to the restaurant. In 2002, the restaurant paid the defendant $29,060.16 in annual rent. The lease contains a clause that increases the restaurant's rent each year, and by the time of the trial, the restaurant was paying the defendant rent of $30,852 per year. In addition to the restaurant, a second private entity leases a portion of the clubhouse and operates it as a pro shop. The rent required under this lease is $1 per year. The golf course is open, weather permitting, from April 15 until December 15 each year. Accordingly, on March 1, 2002, the golf course was closed and the clubhouse was being used only for the restaurant.

After listening to the musical performance, the plaintiff and his two companions left the restaurant. Before exiting the clubhouse, however, one of the plaintiff's companions stopped to use the restroom while the plaintiff waited in the clubhouse's common entryway. The plaintiff stood near the exit door, adjacent to which was a glass window panel, sometimes called a "lite" or sidelite, which was approximately eighteen to twenty-four inches wide and extended from the floor to the top of the door. While the plaintiff was waiting, his leg collapsed or, in his words, "gave out," and he fell against

the window panel, which shattered as he fell into it and onto the floor. As a result, he received multiple cuts and abrasions from glass shards and slivers as well as some general soreness and emotional distress.

The plaintiff thereafter brought the present action against the defendant to recover for the injuries he sustained from his fall into the sidelite. In his one count amended complaint, he alleged that the defendant was negligent in one or more of the following ways: improperly installing or maintaining the window panel; failing to install shatterproof glass; failing to install the proper glass in an area of ingress and egress as required by the state building code; and failing to warn the plaintiff that the glass was installed improperly and could shatter. In addition, the plaintiff alleged that the defendant was liable for its negligence under § 52-557n. In its answer, the defendant denied it was negligent and alleged a special defense that it was not liable for the plaintiff's injuries under the doctrine of governmental immunity.[2]

After a trial to the court, the defendant was found liable for the plaintiff's injuries suffered as a result of the defendant's negligence. In rejecting the special defense of governmental immunity, the trial court determined that the defendant could be held liable under § 52-557n (a) (1) (B) because the defendant derives a special corporate profit or pecuniary benefit from renting a portion of the clubhouse to the restaurant. Specifically, the trial court concluded that the defendant received a pecuniary benefit from the receipt of more than $29,000 in annual rent from the restaurant.[3]

---

[2] The defendant also asserted contributory negligence as a special defense. The trial court found that the plaintiff's injuries were in no way caused by his own negligence. The defendant does not challenge this determination on appeal.

[3] In contrast, the trial court determined that the $1 in annual rent the defendant charged the pro shop was such a small fee that it would not abrogate the defendant's governmental immunity with regard to pro shop patrons.

Turning to the issue of the defendant's alleged negligence, the trial court found that, although the building code did not require the defendant to replace the type of glass used in the sidelite because construction of the clubhouse predated the applicable building code provisions, the defendant nevertheless was negligent in failing to replace it. The trial court credited the testimony of the plaintiff's expert engineer, who opined that the defendant failed to maintain the building properly and in a safe condition by not replacing the existing glass with a safer type of glass. This appeal followed.[4]

I

The defendant first contends that the trial court improperly determined that it was not immune from liability for its allegedly tortious conduct. Specifically, the defendant contends that its maintenance of the golf course and clubhouse is a governmental function. In addition, the defendant claims that it is not deriving a special corporate profit or pecuniary benefit from the rental of a portion of its clubhouse building to the restaurant because the rental income is applied to maintenance expenses for the property. The defendant particularly takes issue with the trial court's focus on the rental income from the restaurant without viewing it as part of the defendant's overall operation of the golf course. Finally, the defendant contends that the trial court improperly failed to find that the maintenance of the clubhouse building was a discretionary function, which precludes its liability for the plaintiff's injuries under § 52-557n (a) (2) (B).

In response, the plaintiff claims that the trial court properly determined that the defendant was liable under § 52-557n (a) (1) (B). The plaintiff claims that a

[4] The defendant appealed from the judgment of the trial court to the Appellate Court, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

considerable portion of the clubhouse was used as a source of revenue for the defendant, and, thus, the defendant should be liable for its negligent acts that are inextricably linked to this rental property. The plaintiff further argues that the defendant should be held liable in the present case because its negligence was related to the condition of the common entryway to the leased property. In addition, the plaintiff claims that the trial court correctly determined that this court's decision in *Carta v. Norwalk*, 108 Conn. 697, 702, 145 A. 158 (1929), precludes the defendant from arguing that it does not receive a pecuniary benefit because it reinvests the rental income into the maintenance of the clubhouse and golf course. Moreover, the plaintiff contends that the trial court properly determined that it need not consider the expenses related to the operation of the golf course because it was the defendant's failure to maintain in a reasonably safe manner the entryway to the clubhouse that caused the plaintiff's injuries. We affirm the judgment of the trial court.

The issue of whether the defendant is immune under § 52-557n from the injuries caused by its negligent maintenance of the entryway of the clubhouse presents a question of statutory interpretation, and, thus, our review is plenary. See, e.g., *Kinsey v. Pacific Employers Ins. Co.*, 277 Conn. 398, 404, 891 A.2d 959 (2006). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z[5] directs us first to consider the text

---

[5] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and

of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) Id., 405.

In accordance with § 1-2z, we turn first to the text of § 52-557n (a) (1), which provides in relevant part that "[e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by . . . (B) negligence in the performance of functions from which the political subdivision derives a *special corporate profit* or *pecuniary benefit* . . . ." (Emphasis added.) The statute does not define the phrases "special corporate profit" and "pecuniary benefit." "In the absence of a statutory definition, words and phrases in a particular statute are to be construed according to their common usage. . . . To ascertain that usage, we look to the dictionary definition of the term." (Internal quotation marks omitted.) *Chatterjee* v. *Commissioner of Revenue Services*, 277 Conn. 681, 690, 894 A.2d 919 (2006); General Statutes § 1-1 (a). Construing these two phrases according to their common usage, nevertheless, results in ambiguity. Even if we put aside the modifier "special corporate" in the phrase, "special corporate profit," the term profit itself is susceptible to multiple common meanings. For example, profit commonly can mean either revenue in

does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

excess of expenses or more generally an advantage, benefit, gain or valuable return. Webster's Third New International Dictionary (1993). The second phrase is also susceptible to multiple meanings because "pecuniary benefit" commonly means a "benefit capable of monetary valuation"; Black's Law Dictionary (7th Ed. 1999); and a benefit commonly can mean an advantage, privilege, profit, or gain. Id. Accordingly, we conclude that the text of § 52-557n (a) (1) fails to yield a plain and unambiguous answer to the question of whether the defendant derives either a special corporate profit or pecuniary benefit from the lease of a portion of the clubhouse to the restaurant.

Resort to the statute's legislative history is somewhat helpful, but not definitive, in resolving the meaning of "special corporate profit" and "pecuniary benefit." Section 52-557n was enacted as § 13 of the Tort Reform Act of 1986, Public Acts 1986, No. 86-338 (act). This court has described the act as being "drafted in response to rapidly rising insurance rates, which, some believed, would be curtailed if tort liability could be limited and systematized. As finally enacted, the act represents a complex web of interdependent concessions and bargains struck by hostile interest groups and individuals of opposing philosophical positions." *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 185, 592 A.2d 912 (1991).

Although the legislative history of § 13 of the act provides no definition of "special corporate profit" or "pecuniary benefit," it does suggest that these terms were drawn from the common law of municipal liability. Senator Richard B. Johnston, the proponent of the legislation in the Senate and chairman of the judiciary committee, described § 13 (a) of the act as "codify[ing] certain elements of common law liability as they apply to political subdivisions, by identifying three areas where liability exists. First, the negligent act within

the [s]cope of employment or official duties. Second, negligence in the course of conduct involving profit or pecuniary benefit to that political subdivision. Third, the creation of a nuisance, except in those instances where a defective road or bridge case can only be brought under other existing statutes."[6] 29 S. Proc., Pt. 10, 1986 Sess., p. 3445. In contrast, subsection (b), which enumerated specific instances in which a municipality is immune from liability, was described as creating "brand new immunities to municipalities that were never there before . . . ." 29 H.R. Proc., Pt. 22, 1986 Sess., p. 8088, remarks of Representative Robert F. Frankel. Although Senator Johnston's statement indicates that § 52-557n (a) (1) (B) was meant to codify municipal common-law liability, we cannot conclude that his interpretation was definitive because a number of other legislators generally viewed the municipal liability section of the act as either altering individuals' existing right to bring an action against a municipality, or, at the very least, as having an unclear impact on individuals' right to sue a municipality.[7] See 29 H.R.

---

[6] The proponent of the act in the House of Representatives, Representative Robert G. Jaekle, did not comment on whether § 52-557n (a) (1) (B) was meant to codify the common law. He did, however, state that under this subsection a municipality can be held liable for "[n]egligence in the performance of functions from which basically the town derives any sort of benefit." 29 H.R. Proc., Pt. 16, 1986 Sess., p. 5929, remarks of Representative Jaekle.

[7] This conclusion is consistent with this court's prior examination of the legislative history of § 13 of the act, in which we described it as "worse than murky; it is contradictory. . . . The transcripts of legislative hearings on the bill are full of heated debate over § 13 [of the act], dealing with municipal liability, but the legislators seemed not to agree as to its meaning. The record of legislative debate does indicate that § 13 was intended, in a general sense, both to codify and to limit municipal liability, but it also reflects confusion with respect to precisely what part of the preexisting law was being codified, and what part was being limited." *Sanzone* v. *Board of Police Commissioners*, supra, 219 Conn. 188.

Moreover, the legislature's confusion over the extent that the act was codifying or altering Connecticut tort law is further demonstrated by the fact that, in the midst of the debate over the act, the cochairmen and ranking members of the judiciary committee asked the law revision commission to

Proc., Pt. 16, 1986 Sess., p. 5891, remarks of Representative Irving J. Stolberg (commenting, in support of amendment to strike out municipal liability sections, that "sacrifice of individual rights in [the sections of the bill dealing with municipal liability] is extremely extensive"); 29 H.R. Proc., Pt. 22, 1986 Sess., p. 8108, remarks of Representative Michael D. Rybak (describing section on municipal liability as "an absolute mine field, an attempt to codify [200] years of municipal law and statute in probably two weeks"); 29 H.R. Proc., Pt. 16, 1986 Sess., p. 5902, remarks of Representative David Lavine (Commenting, in support of the amendment to strike out municipal liability sections, that "it may be that all this works the way the majority leader suggests that it might. And the word is might. It may be that it won't. But for sure tonight at five minutes after one, we don't know that answer."); 29 S. Proc., Pt. 10, 1986 Sess., p. 3482, remarks of Senator Anthony V. Avallone (Describing § 13 of the act as "a section on municipal liability that I defy anybody in here to explain to me. . . . I've been trying for two weeks to find municipal lawyers who understand it. And they can't."). These remarks may have been directed at the enumerated situations barring liability in § 13 (b) of the act, but this too is unclear from the context and substance of these remarks. We turn next to the common-law backdrop against which this section was enacted in an effort to determine whether the phrases "special corporate profit" and "pecuniary benefit" were meant to draw

---

prepare an analysis comparing the act with the state's preexisting tort law. See Report of the Law Revision Commission to the Judiciary Committee Comparing Public Act 86-338 and Prior Connecticut Law (1987) p. 1. With regard to the municipal liability section of the act, it should be noted that the law revision commission concluded that the act "codifie[d] municipal liability in terms of the same negligence and nuisance principles that governed under common law . . . ." Id., p. 23. The report speculated that the act may have departed from the common law in subsection (b) wherein it enumerated specific instances in which the municipality would not be liable. Id., pp. 22–23.

their meaning from and to codify the preexisting common law.

At common law, a municipality was, under certain circumstances, immune from liability for the torts it committed. See, e.g., *Abbot* v. *Bristol,* 167 Conn. 143, 150 and n.2, 355 A.2d 68 (1974); *Carta* v. *Norwalk,* supra, 108 Conn. 701–702; *Hourigan* v. *Norwich,* 77 Conn. 358, 364–65, 59 A. 487 (1904). The source of this municipal immunity was the state's sovereign immunity. *Hourigan* v. *Norwich,* supra, 364–65; see also 18 E. McQuillin, Municipal Corporations (3d Ed. Rev. 2003) § 53.23, p. 380 ("rule of immunity for governmental acts and liability for corporate or proprietary acts is grounded in common-law sovereign immunity"); 5 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 29.6, p. 624 (municipal immunity "was commonly rationalized by saying that the municipality is the agent or representative of the state in performing governmental functions and so shares the state's immunity, but that it has no sovereignty or immunity of its own"). This court explained in *Hourigan* v. *Norwich,* supra, 364, that when the state performs its governmental function through an agent, "the agent cannot be sued for injuries resulting from a strict performance of the agency. In such case the act is regarded as the act of the [s]tate and not that of the agent, who is the mere instrument of the [s]tate and nothing more . . . ." Similarly, a municipality is the agent of the state "in the exercise of certain governmental powers . . . [and when] the [s]tate imposes upon an incorporated city the absolute duty of performing some act which the [s]tate may lawfully perform and pertaining to the administration of government, the city in the performance of that duty may be clothed with the immunities belonging to the mere agent of the [s]tate . . . ." Id.

The common law also recognized that a municipality is not just restricted to acting as the agent of the state,

but may engage in acts for its own corporate benefit or for the benefit of its inhabitants. Id.; see also *Winchester* v. *Cox,* 129 Conn. 106, 109, 26 A.2d 592 (1942) ("functions of a municipal corporation fall into two classes, those of a governmental nature, where it acts merely as the agent or representative of the state in carrying out its public purposes, and those of a proprietary nature, where it carries on activities for the particular benefit of its inhabitants"). In this latter situation, the municipality "is not clothed with [the state's] immunities and is liable to be sued for injuries inflicted through its negligence in the performance of such an act." *Hourigan* v. *Norwich,* supra, 77 Conn. 364; see also 18 E. McQuillin, supra, § 53.23, p. 381 ("[s]overeign immunity protects sovereign governments, such as states, and municipalities when acting as agents of the state, but not municipal corporations acting on their own behalf"); see generally W. Williams, Liability of Municipal Corporations for Tort (1901) pp. 8–9. Thus, this court has stated that a municipality's immunity from liability for injuries applies only when it "is engaged in the performance of a public duty for the public benefit, and not for its own corporate profit . . . ." *Richmond* v. *Norwich,* 96 Conn. 582, 588, 115 A. 11 (1921). Accordingly, the distinction between whether the municipality was acting in its governmental capacity, or in its corporate or proprietary capacity, was, under the common law, the litmus test for whether the municipality would be held liable for its negligence.

In determining whether a municipality's activity was proprietary in nature, this court, along with those of other jurisdictions, has examined whether the activity generated a *"special corporate benefit* or *pecuniary profit* inuring to the municipality." (Emphasis added.) *Carta* v. *Norwalk,* supra, 108 Conn. 702; accord *Hannon* v. *Waterbury,* 106 Conn. 13, 17, 136 A. 876 (1927) ("test to apply is to ascertain whether the act or function has

within it the *special corporate benefit or pecuniary profit* of the municipality affected" [emphasis added; internal quotation marks omitted]); *Richmond* v. *Norwich*, supra, 96 Conn. 588 (municipality liable for negligent act committed while "engaged in the performance of acts done in the management of its property or rights for its own *corporate benefit or profit* and that of its inhabitants" [emphasis added]); *Hourigan* v. *Norwich*, supra, 77 Conn. 365 (municipality may be liable for acts done "in the management of property or rights voluntarily held by them for their own *immediate profit or advantage as a corporation,* although inuring, of course, ultimately to the benefit of the public" [emphasis added; internal quotation marks omitted]); 18 E. McQuillin, supra, § 53.23, p. 383 ("[w]here the municipality's officers or servants are in the exercise of power conferred upon the municipality for its *private benefit or pecuniary profit,* and damage results from their negligence or misfeasance, the municipality is liable to the same extent as in the case of private corporations or individuals" [emphasis added]); 5 F. Harper, F. James & O. Gray, supra, § 29.6, p. 627 (one of most often invoked criteria for determining if municipality is operating in proprietary or governmental capacity is "whether the function is allocated to the municipality for *its profit or special advantage* or whether [it is] for the purpose of carrying out the public functions of the state without special advantage to the city" [emphasis added]). The imposition of liability under § 52-557n on municipalities when they are engaged in a function from which they derive a "special corporate profit" or "pecuniary benefit" is nearly identical to municipalities' common-law liability for acts for their own "special corporate benefit

or pecuniary profit."[8] Because "the legislature is presumed to be aware of prior judicial decisions involving common-law rules"; *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 793–94 n.21, 865 A.2d 1163 (2005); see also 2B J. Sutherland, Statutes and Statutory Construction (6th Ed. Singer 2000) § 50:01, p. 140 ("legislature is presumed to know the common law before statute was enacted"); and General Statutes § 1-1 (a) directs that words or phrases that "have acquired a peculiar and appropriate meaning in the law . . . shall be construed and understood accordingly," we conclude that the use of these phrases was an attempt to codify municipal common-law liability for acts performed in a proprietary capacity.[9] Cf. *Yale Diagnostic Radiology* v. *Estate of Fountain*, 267 Conn. 351, 361, 838 A.2d 179 (2004) (concluding that General Statutes § 46b-37 [b] [2] codifies common-law rule that "both parents are primarily responsible for providing necessary goods and services to their children"); *Gerrity* v. *R.J. Reynolds Tobacco Co.*, 263 Conn. 120, 127, 818 A.2d 769 (2003) (observing that product liability act was designed in part to codify common law of product liability).

Having decided that § 52-557n (a) (1) (B) codifies the common-law rule that municipalities are liable for their negligent acts committed in their proprietary capacity, we must examine what the common law meant by the

[8] We note that the phrases used in § 52-557n (a) (1) (B) transpose the terms "profit" and "benefit" from the common-law test. Nevertheless, as discussed previously herein, the legislative history does not provide any explanation for the particular phrasing employed by the legislature. Accordingly, we are left to conclude that this difference from the common-law test was incidental.

[9] We twice before have assumed, without deciding, that § 52-557n (a) (1) (B) codified the common law. See *Martel* v. *Metropolitan District Commission*, 275 Conn. 38, 53, 881 A.2d 194 (2005); *Elliott* v. *Waterbury*, 245 Conn. 385, 410–11, 715 A.2d 27 (1998). Although we conclude that § 52-557n (a) (1) (B) codifies the common law with regard to municipal liability for proprietary functions, we express no opinion on the other grounds for municipal liability in § 52-557n (a) (1).

phrases "special corporate benefit" and "pecuniary profit." At the outset, we recognize that the distinction between a municipality's governmental and proprietary functions has been criticized as being illusory, elusive, arbitrary, unworkable and a quagmire. *Indian Towing Co.* v. *United States*, 350 U.S. 61, 65, 76 S. Ct. 122, 100 L. Ed. 48 (1955) (calling governmental-proprietary distinction "quagmire that has long plagued the law of municipal corporations"); *Tadjer* v. *Montgomery County*, 300 Md. 539, 546, 479 A.2d 1321 (1984) (remarking that "distinction between governmental and proprietary functions is sometimes illusory in practice"); *Hudson* v. *East Montpelier*, 161 Vt. 168, 177 n.3, 638 A.2d 561 (1993) (noting that its application of distinction has led to arbitrary results); 18 E. McQuillin, supra, § 53.02.10, p. 148 (calling modern distinction between municipality's dual functions elusive); W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 131, p. 1054 (observing that distinction "is basically unworkable"). Despite this criticism, Connecticut, like a minority of other jurisdictions,[10] has not disavowed the application of this distinction.

We begin with municipal activities that are *not* for a municipality's special corporate benefit or pecuniary profit. If a municipality is acting only as the "agent or representative of the state in carrying out its public

---

[10] Due to the dissatisfaction with the distinction between proprietary and governmental acts, many courts and legislatures have moved away from it. See 4 Restatement (Second), Torts § 895C, pp. 408–409 (1979); 5 F. Harper, F. James & O. Gray, supra, § 29.6, p. 639. Nevertheless, this distinction has survived in one form or another in a handful of jurisdictions. See, e.g., Mich. Comp. Laws § 691.1413 (2006) ("[I]mmunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees."); *Tadjer* v. *Montgomery County*, supra, 300 Md. 539; *Hillerby* v. *Colchester*, 167 Vt. 270, 706 A.2d 446 (1998).

purposes"; *Winchester* v. *Cox*, supra, 129 Conn. 109; then it clearly is not deriving a special corporate benefit or pecuniary profit. Two classes of activities fall within the broader category of acting as the agent of the state: "[1] those imposed by the [s]tate for the benefit of the general public, and [2] those which arise out of legislation imposed in pursuance of a general policy, manifested by legislation affecting similar corporations, for the particular advantage of the inhabitants of the municipality, and only through this, and indirectly, for the benefit of the people at large. . . . For example, the maintenance of the public peace or prevention of disease would fall within the first class; *Keefe* v. *Union*, 76 Conn. 160, 166, 56 [A.] 571 [1903]; while the maintenance of a park system would fall within the second class." (Citations omitted; internal quotation marks omitted.) *Hannon* v. *Waterbury*, supra, 106 Conn. 16; see also *Spitzer* v. *Waterbury*, 113 Conn. 84, 87–88, 154 A. 157 (1931) (construction of storm water sewers is governmental function because it is part of duty imposed by state on municipality to maintain highways within its limits); *Epstein* v. *New Haven*, 104 Conn. 283, 284, 132 A. 467 (1926) (use of municipal property as public park is governmental function because "control of public parks belongs primarily to the [s]tate and municipalities in operating and managing them act as governmental agencies exercising an authority delegated to them by the [s]tate"). While the distinction remains clear with regard to the first class of activities, it becomes more difficult to discern in the second class of activities. For example, the second class of activities encompasses functions that appear to be for the sole benefit of a municipality's inhabitants, but nevertheless provide indirect benefits to the general public because the activities were meant to improve the general health, welfare or education of the municipality's inhabitants. See *Hannon* v. *Waterbury*, supra, 18 (operating swim-

ming pool was governmental function because it was for "education of the people of the city in teaching them to swim and thus guarding their lives against the accident of drowning, promoting a most useful and beneficial form of exercise, and teaching cleanliness of habits of living and thus preserving their health"); *Pope* v. *New Haven*, 91 Conn. 79, 81, 99 A. 51 (1916) (celebration of Independence Day was governmental function because its aim was to "instruct the people generally and to arouse and stimulate patriotic sentiments and love of country"). The municipality may even charge a nominal fee for participation in a governmental activity and it will not lose its governmental nature as long as the fee is insufficient to meet the activity's expenses. See *Hannon* v. *Waterbury*, supra, 17–18 (charged small fee to use municipal pool, but fee did not cover maintenance expenses); see also *Couture* v. *Board of Education*, 6 Conn. App. 309, 312–13, 505 A.2d 432 (1986) (sponsoring high school football game, at which small charge was paid to be spectator, was governmental act because part of delegated duty from state to provide education).

On the other side of the distinction, a municipality generally has been determined to be acting for its own special corporate benefit or pecuniary profit where it engages in an activity "for the particular benefit of its inhabitants"; *Winchester* v. *Cox*, supra, 129 Conn. 109; or if it derives revenue in excess of its costs from the activity.[11] *Martel* v. *Metropolitan District Commission*,

---

[11] The existence of an actual pecuniary profit is a factor in deciding whether the function is proprietary, but reliance on it alone would create problematic incentives and arbitrary results. For example, the Michigan Supreme Court in *Hyde* v. *University of Michigan Regents*, 426 Mich. 223, 258, 393 N.W.2d 847 (1986), observed: "If the availability of immunity turned solely upon an examination of the ledgers and budgets of a particular activity, a fiscally responsible governmental agency would be 'rewarded' with tort liability for its sound management decisions. Such a rule could discourage implementation of cost-efficient measures and encourage deficit spending. Moreover, the rule would be difficult to implement and inconsistent in its results. If

275 Conn. 38, 53, 881 A.2d 194 (2005) (operation of water utility for profit is proprietary function); *Elliott v. Waterbury*, 245 Conn. 385, 412–14, 715 A.2d 27 (1998) (same); *Richmond* v. *Norwich*, supra, 96 Conn. 584, 588 (same); see also *Tadjer* v. *Montgomery County*, supra, 300 Md. 549–50 (if income derived from activity substantially exceeds expenses, such as rent and operational costs, then it is proprietary in nature). When a municipality derives substantial revenue from its commercial use of municipal property, it has been considered nonetheless to be engaged in a proprietary function even if it reinvests that revenue back into the property's maintenance expenses or to pay down debt related to the property. See *Carta* v. *Norwalk*, supra, 108 Conn. 702 (if municipality is deriving revenue or profit from renting its property, fact that it is "applied to the maintenance of the property and the reduction of the debt incurred in its construction or acquirement, or otherwise ultimately to the benefit of the public, is not sufficient to create the immunity"); *Hourigan* v. *Norwich*, supra, 77 Conn. 365 (municipality "uses works constructed for the public benefit for its corporate profit, when the profits are to be applied to the maintenance of the works and the reduction of the debt incurred by the corporation in their construction"); but cf. *Coleman* v. *Kootsillas*, 456 Mich. 615, 621, 575 N.W.2d 527 (1998) (if revenue generated from activity "is used only to pay current and long-range expenses involved in operating the activity, this could indicate that the primary purpose of the activity was not to produce a pecuniary profit"). Accordingly, it has been stated that a municipality is engaged in a proprietary function when it acts "very much like private enterprise . . . ." W. Prosser & W. Keeton, supra, § 131, p. 1053.

---

an activity operates at a loss one year, but makes a profit the next year, does the availability of immunity from tort liability also change?"

In the specific context of leasing municipal property, this court and courts of other jurisdictions generally have concluded that a municipality acts in its proprietary capacity when it leases municipal property to private individuals. See *Carta* v. *Norwalk*, supra, 108 Conn. 699–702 (lease of concession facilities at municipal beach for $2500 was prima facie evidence that municipality was engaged in proprietary function); see also *District of Columbia* v. *Richards*, 128 F.2d 297, 299 (D.C. Cir. 1942) (municipality was liable for negligence as owner and operator of building in which it leased market stands to merchants); *Chafor* v. *Long Beach*, 174 Cal. 478, 489–90, 163 P. 670 (1917) (municipality's maintenance of auditorium that it leased to private individuals was proprietary function regardless of whether it charged rent); *Madisonville* v. *Poole*, 249 S.W.2d 133, 134 (Ky. 1952) (municipality concedes that leasing clubhouse to private individuals was proprietary function); *Wood* v. *Oxford*, 290 Mass. 388, 388–91, 195 N.E. 321 (1935) (municipality liable for injuries caused by negligent maintenance of town hall because rooms in town hall were rented out to private parties); *Oliver* v. *Worcester*, 102 Mass. 489, 502 (1869) (no municipal immunity when it rented substantial portion of municipal building to private persons); *Stephenson* v. *Garner*, 136 N.C. App. 444, 454, 524 S.E.2d 608 (lease of municipal property for construction of cellular telephone tower was proprietary function), appeal denied, 352 N.C. 156, 544 S.E.2d 243 (2000); *Chupek* v. *Akron*, 89 Ohio App. 266, 269, 101 N.E.2d 245 (1951) (lease of municipal stadium to private individual to hold automobile race was proprietary function); *Dean* v. *Board of Trustees of Soldiers & Sailors Memorial Building*, 65 Ohio App. 362, 364–65, 29 N.E.2d 910 (1940) (no governmental immunity when portions of building are leased to private entities and operated as movie theater, storerooms and office space); *Richmond* v. *Grizzard*, 205

Va. 298, 301, 136 S.E.2d 827 (1964) (lease of portion of municipal building to church was not governmental function); 18A E. McQuillin, supra, § 53.91.10, p. 129 ("liability applies where a municipality deals with property, bought or used in connection with a governmental activity, for a corporate activity, as by renting it"); but cf. *Hartness* v. *Allegheny County*, 349 Pa. 248, 252–53, 37 A.2d 18 (1944) (immunity applied for negligent maintenance of county courthouse where only proprietary uses of building were few pay telephones, bootblack stand, and some clerks, part of whose job was to order supplies for county's restaurants and amusement enterprises). Accordingly, a municipality may be held liable if there is an "inextricable link or inherently close connection" between its negligent act or omission and the rental of its property. *Martel* v. *Metropolitan District Commission*, supra, 275 Conn. 56 (municipality liable only if there is "inextricable link or inherently close connection" between alleged negligence and municipality's operation of proprietary function); *Carta* v. *Norwalk*, supra, 108 Conn. 702 (municipality "is responsible for its negligent acts or omissions in connection with the property rented").

Turning to the present case, we conclude that the defendant can be held liable for the plaintiff's injuries because it was acting in its proprietary capacity when it leased a portion of the clubhouse to the restaurant and there is an "inextricable link or inherently close connection"; *Martel* v. *Metropolitan District Commission*, supra, 275 Conn. 56; between the defendant's allegedly negligent maintenance of the sidelite in the clubhouse's entryway and the rental of the restaurant. By examining the character of the activity at issue, it is apparent that leasing a portion of a municipal building as a restaurant stands in stark contrast from those activities in which this court has determined that the municipality was acting as the state's agent for the direct or

indirect benefit of the general public. See, e.g., *Spitzer* v. *Waterbury,* supra, 113 Conn. 87–88 (storm water sewers); *Vezina* v. *Hartford,* 106 Conn. 378, 379–81, 138 A. 145 (1927) (fire department); *Hannon* v. *Waterbury,* supra, 106 Conn. 17–18 (municipal swimming pool); *Epstein* v. *New Haven,* supra, 104 Conn. 283 (public park); see also *Schmidt* v. *Breeden,* 134 N.C. App. 248, 253, 517 S.E.2d 171 (1999) (recounting other traditional governmental functions as including "operation of jails, public libraries . . . and city garbage services"). Rather, the leasing of a portion of a municipal building for a substantial rent to a private party to operate a business is an act that very much resembles private enterprise, and, accordingly, consistently has been determined to be a proprietary function. See *District of Columbia* v. *Richards,* supra, 128 F.2d 299; *Oliver* v. *Worcester,* supra, 102 Mass. 502; *Stephenson* v. *Garner,* supra, 136 N.C. App. 454; *Chupek* v. *Akron,* supra, 89 Ohio App. 266, 269; *Dean* v. *Board of Trustees of Soldiers & Sailors Memorial Building,* supra, 65 Ohio App. 364–65; *Richmond* v. *Grizzard,* supra, 205 Va. 301.

In addition to the fact that the defendant's leasing of the restaurant is of a similar nature and character as private enterprise, it appears that the defendant was, *in fact,* deriving a pecuniary benefit from the lease. The defendant's acting deputy director of public works, Joseph A. Geary, testified that the proceeds of the lease were reinvested into a fund that is used to operate the golf course. Thus, the defendant received a pecuniary benefit from the lease because it was able to use the proceeds from the lease to offset its costs in maintaining the golf course.[12] Moreover, even if we were to assume

---

[12] In addition to its receipt of lease income, the defendant also was benefited by the improvements that the lease required the restaurant to make to the clubhouse, such as "providing cooling for the main clubhouse, adding a full liquor sit-down bar . . . [and] refurbishing the exterior and interior walls of the building . . . ."

that the golf course is such an interrelated function to the restaurant that we must view its revenues and expenses in the aggregate, the fact that the revenue or profit derived from the commercial use of municipal property "is applied to the maintenance of the property and the reduction of the debt incurred in its construction or acquirement, or otherwise ultimately to the benefit of the public, is not sufficient to create [governmental] immunity." *Carta* v. *Norwalk*, supra, 108 Conn. 702. We therefore conclude that the defendant's leasing of a portion of the clubhouse to the restaurant is a proprietary function.

Having concluded that leasing a portion of the clubhouse to be operated as a restaurant is a proprietary function, we next must consider whether there is an "inextricable link or inherently close connection"; *Martel* v. *Metropolitan District Commission*, supra 275 Conn. 56; between this function and the alleged negligent act—failing to maintain properly the window panel. The entryway where the plaintiff was injured was the main entrance to the clubhouse and one of two entrances by which a patron could access the restaurant. Further, the lease obligates the defendant to maintain the common areas of the building that provide access to the restaurant. Therefore, we conclude that there was an inextricable link and close connection between the defendant's negligent maintenance of the glass sidelite in the common entryway and the leasing of the restaurant portion of the clubhouse.

The defendant claims nonetheless that the maintenance of the clubhouse was a governmental function because this building was located on a municipal golf course, and a golf course, like a park or swimming pool, is a recreational facility that falls within the scope of a municipality's governmental functions. Even if we were to assume that the operation of a municipal golf

course is a governmental function,[13] we cannot conclude that the fact that the restaurant is in a building located on a municipal golf course transforms an otherwise commercial function into a governmental one. First, the present case does not present a situation in which two municipal functions are so interrelated that the nature of each function cannot be analyzed independently. Indeed, the restaurant, in the present case, was operated independently of the golf course because it was open to the public even when the golf course was closed and its patrons, like the plaintiff, came there for reasons other than golf. Although many golfers likely patronized the restaurant before and after playing golf, it hardly can be said that the existence of a restaurant is essential to a functioning golf course. Second, the inquiry of whether the state's sovereign immunity extends to shield a municipality turns on the nature and character of the act and not its location. See *Hannon* v. *Waterbury*, supra, 106 Conn. 17 (whether function is governmental "is determined from a consideration of the nature of the duty imposed or the privilege conferred, and of the character of the act done or the function performed"); see also *Rhodes* v. *Palo Alto*, 100 Cal. App. 2d 336, 341, 223 P.2d 639 (1950) (determining that operation of community theater was proprietary function despite its location within public park because "[i]t is the nature of the activity, not its location . . . that determines its proprietary character").

The defendant also argues that it should not be held liable for its negligence because it is immune under § 52-557n (a) (2) (B) for negligent acts or omissions that require the exercise of judgment or discretion and that the maintenance of the common areas of the club-

---

[13] This court never has decided whether a municipal golf course is a proprietary or governmental function.

house was such a discretionary function.[14] We disagree. When a municipality is engaged in a governmental function, its immunity is restricted to discretionary acts and not ministerial acts. See *Heigl* v. *Board of Education*, 218 Conn. 1, 4–5, 587 A.2d 423 (1991) ("[A] municipality is immune from liability for the performance of *governmental acts* as distinguished from ministerial acts. . . . *Governmental acts* are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . [M]inisterial acts are performed in a prescribed manner without the exercise of judgment or discretion . . . ." [Citations omitted; emphasis added; internal quotation marks omitted.]); accord *Elliott* v. *Waterbury*, supra, 245 Conn. 411 ("under the common law . . . both municipalities and their employees or agents have immunity from negligence liability *for governmental acts* involving the exercise of judgment or discretion" [emphasis added]). Because we concluded that the defendant was engaged in a proprietary act and not a governmental act, the distinction between discretionary and ministerial acts does not apply. See *Adriance* v. *Standish*, 687 A.2d 238, 241 (Me. 1996) ("[i]n cases where the questioned conduct has little or no purely governmental content but instead resembles decisions or activities carried on by people generally, there is an objective standard for judgment by the courts and the doctrine of discretionary immunity does not bar the action" [internal quotation marks omitted]); see also W. Prosser & W. Keeton, supra, § 132, p. 1065 (generally no immunity for discretionary acts "where governmental concerns are minimally involved and ordinary standards of safety can be applied").

## II

The defendant next claims that the trial court improperly determined that it negligently had maintained the

---

[14] The defendant does not claim that § 52-557n (a) (2) (B) altered the common law. Accordingly, we will assume, without deciding, that § 52-557n (a) (2) (B) codifies the common law.

clubhouse because the plaintiff proffered insufficient evidence to support this finding. The defendant concedes that it had a duty to the plaintiff, as an invitee, to inspect reasonably and maintain the clubhouse in order to render it reasonably safe. The defendant claims, however, that the plaintiff failed to proffer sufficient evidence to establish that the standard of care under the circumstances of the present case required it to replace the glass in the sidelite with a safer type of glass. In particular, the defendant asserts that the only evidence proffered by the plaintiff on this point consisted of references to federal regulations and the state building code, both of which did not apply to the clubhouse because they were adopted after it was built. In addition, the defendant claims that the plaintiff failed to introduce any evidence that the defendant had actual or constructive notice that the window panel was unsafe or hazardous. Rather, the defendant contends that it had no notice of the window's dangerous condition as supported by Geary's testimony that, in his twenty-six years of employment with the defendant's bureau of parks and recreation, he knew of no person that had been injured by coming into contact with the sidelite. In response, the plaintiff claims that it proffered sufficient evidence that the defendant had breached its duty because the building code was some evidence of the standard of care to which the defendant was required to conform its conduct. In addition, the plaintiff contends that the length of time that the sidelite existed in its defective condition was a sufficient basis from which the trial court could have found that the defendant had constructive notice. We agree with the plaintiff.

The following testimony is relevant to the resolution of these claims. The plaintiff's expert witness, Michael E. Shanok, a consulting engineer specializing in forensics and safety, testified that, based on the circum-

stances relating to the plaintiff's injury, the glass installed in the sidelite next to the door was very likely annealed glass. Shanok further testified that, because this type of glass is not toughened in any way, it "is by far the most easy to break among the various types of glass . . . ." In addition, Shanok testified that there is a substantial risk of injury if one were to fall into annealed glass because it has a tendency to break into large, sharp shards of glass. He also explained in his testimony that placing a glass window panel next to an entryway door is recognized as an "extremely hazardous location because people are constantly going one way or another through that set of doors, and the possibility of someone coming into contact with the [sidelite] is relatively high." He remarked that the use of annealed glass in a sidelite next to a door is more dangerous than using it in a window on a wall because there is greater likelihood that someone may come into contact with the sidelite as "a person might mistake [it] for a door and push their hand against it thinking they're going to open a door . . . ." Highlighting the risk of placing a glass sidelite next to an entryway door, Shanok testified that, although not applicable to the clubhouse,[15] the building code, enacted by the office of the state building inspector in approximately 1970, and the regulations of the United States Consumer Product Safety Commission, promulgated in approximately 1980, both regard the entryway as a highly hazardous location and regulate the type of glass that can be used in this area. Shanok additionally testified that to reduce the risk of injury from such a hazardous condition, a building manager or landlord should engage in the process of risk management, "which is simply the inspection of [its] premises

---

[15] On cross-examination, Shanok testified that, if a building had been built before 1970, the building code and regulations did not require that the windows be replaced as long as they were in a serviceable condition. Geary testified that the clubhouse was built in approximately 1962 and the sidelite remained in an undamaged condition.

to locate hazards and deal with them so that you lessen the possibility of liability or accidents [on its] premises." Under the facts of the present case, Shanok testified that the risk posed by the sidelite could have been lessened by replacing the annealed glass in the panel with tempered, thermally toughened, or laminated glass because these types of glass are more difficult to break and, if they do break, they are less likely to cause lacerations because they break into small cubes. Accordingly, Shanok concluded that the sidelite next to the entryway door was not maintained properly by the defendant because the risk it posed should have been identified and mitigated by replacing the annealed glass with tempered, thermally toughened, or laminated glass.

Geary next testified that, as acting deputy director of public works and before that as acting director of the defendant's parks department, he was responsible for overseeing the clubhouse. He testified that he did not know the technical name for the type of glass that was used in the sidelite, but described it as "regular" glass. In addition, Geary testified that he had observed the shattered window on the night of the plaintiff's injuries and that the shards of glass appeared to be sharp and "in smaller pieces than when safety glass would break." Geary further testified that an employee of the defendant's parks department visually inspected the clubhouse on a weekly basis, but that neither he nor any of his subordinates checked the building code regarding the type of glass to be used in an entryway. Geary also testified that, prior to the plaintiff's injury, the parks department's records did not indicate that anyone had injured themselves on the window panel and he did not recall in his twenty-six years of employment with the parks department that anyone had injured themselves on this sidelite. Finally, Geary testified that he had no knowledge that there was anything defective

with regard to this sidelite or that it was in any kind of damaged condition.

As an initial matter, we note that "[t]he standards governing our review of a sufficiency of evidence claim are well established and rigorous. . . . [W]e must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the [trier's] verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the [trier] could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." (Citations omitted; internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 442, 815 A.2d 119 (2003). To the extent that the defendant challenges the trial court's factual findings, we review such claims under our clearly erroneous standard of review. See *Edmands* v. *Cuno, Inc.*, 277 Conn. 425, 438, 892 A.2d 938 (2006). "A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) Id., 438–39.

## A

We turn first to the defendant's claim that the plaintiff failed to proffer sufficient evidence that the failure to replace the glass in the sidelite was a breach of the standard of care owed to the plaintiff. "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty,

and then, if one is found, it is necessary to evaluate the scope of that duty. . . . The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand." (Citations omitted; internal quotation marks omitted.) *Maffucci* v. *Royal Park Ltd. Partnership*, 243 Conn. 552, 566, 707 A.2d 15 (1998). Put another way, the question of what a reasonable person would have done under the circumstances is a question to be determined by the trier of fact, except where the individual's conduct "clearly has or has not conformed to what the community requires, and that no reasonable [trier of fact] could reach a contrary conclusion." W. Prosser & W. Keeton, supra, § 37, p. 237; accord 2 Restatement (Second) Torts, Standard of Conduct, § 285, comment (g), p. 23 (1965) ("jury must itself define the standard of the reasonable man with such particularity as is necessary to make it applicable to the facts of the case before it").

"In general, there is an ascending degree of duty owed by the possessor of land to persons on the land based on their entrant status, i.e., trespasser, licensee or invitee. . . . A possessor of land has a duty to an invitee to reasonably inspect and maintain the premises in order to render them reasonably safe. . . . In addition, the possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover." (Citations omitted.) *Morin* v. *Bell Court Condominium Assn., Inc.*, 223 Conn. 323, 327, 612 A.2d 1197 (1992). There is no dispute that the plaintiff, in the present case, was an invitee of the defendant, and, accordingly, the defendant had a duty to reasonably inspect and maintain the clubhouse in order to render it reasonably safe and to warn the plaintiff of dangers that he could not reasonably be expected to discover. Thus, to determine that the defendant breached this

duty, the trial court had to find that the reasonable maintenance of the clubhouse to keep it reasonably safe required the defendant to replace the glass in the sidelite with a safer type of glass or to post a warning of the danger that the glass posed.

This court previously has not had the opportunity to consider directly whether a building code, which technically does not apply to the defendant's premises, can nonetheless be considered as some evidence of the appropriate standard of care. The closest this court has come to considering this question was in the case of *Dinnan* v. *Jozwiakowski*, 156 Conn. 432, 242 A.2d 747 (1968). In that case, the defendant claimed on appeal that the trial court improperly "instructed the jury with respect to [its] duty to the tenant 'when it refused to consider the standards established by the building code . . . .' " Id., 434. Specifically, the defendant claimed that, the provisions of the New Haven building code, which were used in evidence during the examination of expert witnesses, "must be considered with respect to the standards of safety it sets up." (Internal quotation marks omitted.) Id., 436. This court determined that the trial court's instruction to the jury was not improper because the building code was not violated as it had been enacted after the building was erected. Id. Accordingly, we concluded that "the defendant certainly has no ground to complain of the court's charge that the evidence as introduced in this connection 'was for the purpose of testing the soundness of the opinions given' by the experts." Id. Thus, this court's decision in *Dinnan* precludes a jury instruction that a technically inapplicable building code must be considered as *the* standard of care, or, stated another way, a violation of this building code would not have constituted negligence per se.[16] See also *Baldwin* v. *Jablecki*, 52 Conn.

---

[16] "Negligence per se operates to engraft a particular legislative standard onto the general standard of care imposed by traditional tort law principles, i.e., that standard of care to which an ordinarily prudent person would

App. 379, 382–83, 726 A.2d 1164 (1999) (concluding that trial court properly directed verdict for defendant on plaintiff's negligence per se count based on building code violation because code did not apply to building that was erected prior to code's enactment). Although the question was not before this court, we did not reject the trial court's instruction that the building code could be considered in evaluating expert testimony regarding the standard of care.[17]

---

conform his conduct. To establish negligence, the jury in a negligence per se case need not decide whether the defendant acted as an ordinarily prudent person would have acted under the circumstances. They merely decide whether the relevant statute or regulation has been violated. If it has, the defendant was negligent as a matter of law." (Internal quotation marks omitted.) *Gore* v. *People's Savings Bank*, 235 Conn. 360, 376, 665 A.2d 1341 (1995).

[17] The dissent argues that this court's decision in *Dinnan* supports its position that evidence of an inapplicable building code cannot be used as some evidence of the standard of care. We disagree that *Dinnan* can be read this broadly; rather, we conclude that *Dinnan* is not controlling of today's decision. It must be borne in mind that the defendant in *Dinnan* was challenging the trial court's jury instructions. *Dinnan* v. *Jozwiakowski*, supra, 156 Conn. 434. In evaluating that claim, this court concluded, in cursory fashion, that, because there was no claim that the building code was violated, the "defendant certainly has no ground to complain of the court's charge that the evidence as introduced in this connection 'was for the purpose of testing the soundness of the opinions given' by the experts." Id., 436. This conclusion must be read in light of our standard of review to challenges of jury instructions in which this court "must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Emphasis added; internal quotation marks omitted.) *Vertex* v. *Waterbury*, 278 Conn. 557, 572, 898 A.2d 178 (2006). Accordingly, we conclude that this court's decision in *Dinnan* is limited to the determination that the jury instruction fairly presented the case to the jury because it allowed them to consider the inapplicable building code to test the soundness of the expert's opinions regarding the applicable standard of care. As instructed, the jury was then able to view the standard of care as testified to by the plaintiff's expert in light of the standards set forth in the applicable provisions of the building code. Thus, while the *Dinnan* decision makes clear that the

Although this court has not dealt directly with this question, the District of Columbia Circuit Court of Appeals in *Curtis* v. *District of Columbia*, 363 F.2d 973 (D.C. Cir. 1966), has considered whether such a building code could be used as some evidence of the standard of care. In that case, the plaintiff sought to recover for the injuries he sustained when he fell while walking over a vault, the covering of which was a part of the sidewalk. Id. The plaintiff alleged that he had tripped over a hinge of the covering that protruded approximately one inch above the sidewalk. Id. To establish the standard of care, the plaintiff attempted to introduce into evidence a pertinent section of the District of Columbia building code, which required that vault coverings be flush with the sidewalk. Id., 974. The trial court excluded this evidence because the vault was constructed prior to the adoption of the building code and it was not retroactive in its application. Id. On appeal, the court concluded that, even though the building code had not been violated, it "was evidence of a standard which the jury could consider in determining whether the defendants had exercised due care . . . ." Id., 975. The court reasoned that "the officials with expertise and duty in the matter, decided that in the interest of safety such protrusions [from the vault coverings] should at least be prohibited in future construction. From this it follows that these safety provisions may appropriately be held competent, not in and of themselves as evidence of negligence, but as evidence of a standard by which the jury must measure the conduct of the defendants in determining whether they exercised that due care the law required in the situation." Id., 976; see also *Hammond* v. *International Har-*

conformance or noncoformance with the inapplicable building code was not dispositive of the plaintiff's negligence claim, the decision cannot be stretched to control the question of whether the trier of fact is prohibited from considering such a building code, in light of expert testimony, to arrive at the standard of care.

*vester Co.*, 691 F.2d 646, 651 (3d Cir. 1982) (concluding that, in products liability action, Occupational Safety and Health Administration regulation relating to tractor safety equipment, although not applicable because it was enacted after tractor was manufactured, supported finding that tractor was defective because it was missing this equipment); *Klein* v. *District of Columbia*, 409 F.2d 164, 166–67 (D.C. Cir. 1969) (concluding that municipal building code should have been admitted as evidence of standard of care even though it was enacted after structure was installed); *Martin* v. *Louisiana Power & Light Co.*, 546 F. Sup. 780, 783 (E.D. La. 1982) (noting, in dicta, that "later-enacted standards may be admitted as evidence of the proper standard of care when the facts and circumstances indicate such an admission will be helpful"), aff'd, 719 F.2d 403 (5th Cir. 1983); *Polk* v. *Los Angeles*, 26 Cal. 2d 519, 540–41, 159 P.2d 931 (1945) (regulations regarding maintenance of power lines even if applicable only to public utilities were admissible to establish standard of care of municipality in maintaining its power lines).

We are in agreement with the court in *Curtis* that the building code is both relevant and material to the question of the standard of care, in the present case, because it reflects the experience and expertise of what authorities believe to be the safe use of glass in an entryway, albeit for future construction.[18] See Conn.

---

[18] The dissent argues that evidence of the inapplicable building code was not relevant to the inquiry into whether the defendant was required to replace the glass in the sidelite in order to render the clubhouse "reasonably safe." The dissent reasons that the building code's prohibition of the use of annealed glass in only new construction reflects a determination that preexisting uses of such glass in entryways were not dangerous enough to warrant remediation. Accordingly, the dissent contends that the fact that the building code does prohibit the use of annealed glass in new construction "does not reflect any definitive judgment of what is, and what is not, 'reasonably safe.' "

We agree with the dissent that the building code in the context of the clubhouse does not pronounce a *definitive judgment* as to what is, and is not, "reasonably safe," because, as we discussed previously herein, an

Code Evid. § 4-1 (evidence is relevant if it has "any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence"); *State* v. *Estrella*, 277 Conn. 458, 484 n.17, 893 A.2d 348 (2006) ("[e]vidence is material when it is offered to prove a fact directly in issue or a fact probative of a matter in issue"). This determination is buttressed by the similar conclusion of this court and courts of other jurisdictions that statutes, regulations, ordinances, and other safety codes can be considered as some evidence of the standard of care in analogous

---

inapplicable building code provision cannot be used to establish negligence per se. We do, however, believe that the building code does provide some relevant evidence of what is the reasonably safe use of glass in the clubhouse's entryway. The building code is jointly adopted and administered by the state building inspector and the codes and standards committee. General Statutes § 29-252 (a). The state building inspector is required to be a licensed architect or professional engineer with at least ten years of experience. General Statutes § 29-252 (b). Additionally, thirteen of the seventeen members of the codes and standards committee must include: two architects, three engineers, two builders or superintendents, one public health official, two building officials, two fire marshals, and one member of a national building trades labor organization. General Statutes § 29-251. Each of these members must also have ten years of experience in their respective fields. General Statutes § 29-251. The other four members are public members. General Statutes § 29-251. Thus, the building code reflects the reasoned judgment of numerous professionals with extensive relevant experience that in the interests of safety the use of annealed glass in the entryway of buildings should be prohibited in future construction. From this fact, a trier of fact reasonably could infer that the use of annealed glass in the entryway of a building constructed before the effective date of the code also poses a safety hazard. Indeed, it strains logic to interpret the inapplicability of this prohibition to prior construction as a determination that the use of annealed glass in the entryway of older buildings does not pose similar safety concerns. Such an interpretation is made even more doubtful in light of Shanok's testimony that if the glass in the clubhouse was not in a serviceable condition, it would need to be replaced in accordance with the building code. Accordingly, we conclude that Shanok's reference to the building code was relevant because it has a tendency to make it more probable than it would without this evidence that maintaining the clubhouse in a reasonably safe condition required replacing the annealed glass in the entryway.

situations. For example, violations of regulations of the Occupational Safety and Health Administration cannot be used as the grounds for a negligence per se instruction, but these regulations can be admitted into evidence as evidence of the standard of care because they will provide helpful guidance to the trier of fact. See *Wendland* v. *Ridgefield Construction Services, Inc.*, 184 Conn. 173, 181, 439 A.2d 954 (1981). Further, courts of other jurisdictions have allowed the trier of fact to consider regulations that prescribe safety standards as evidence of the standard of care even when the plaintiff was not within the class of individuals that the regulation was meant to protect. See *Koll* v. *Manatt's Transportation Co.*, 253 N.W.2d 265, 270 (Iowa 1977) (evidence of violation of Occupational Safety and Health Administration regulation is admissible evidence of negligence in action brought by plaintiff not covered by regulation); *Manchack* v. *Willamette Industries, Inc.*, 621 So. 2d 649, 652–53 (La. App.) (same), cert. denied, 629 So. 2d 1170 (La. 1993); accord 2 Restatement (Second), supra, § 288B, comment (d), p. 38 (where statute, ordinance, or regulation "prescribes standard precautions for a purpose other than the protection of the person who is injured . . . [t]he fact that such precautions have been prescribed for another purpose may be a relevant fact for the consideration of the triers of fact, as indicating that a reasonable man would have taken the same precautions in the particular case"); W. Prosser & W. Keeton, supra, § 36, p. 231 (referring to use of such statutes, ordinances, or regulations as "statutory custom, which is entitled to admission as evidence" of standard of care). Finally, courts generally have allowed voluntary safety codes to be considered as evidence of the standard of care. See, e.g., *Miller* v. *Yazoo Mfg. Co.*, 26 F.3d 81, 82–84 (8th Cir. 1994) (concluding that it was proper to admit into evidence, in personal injury action, American National Standards

Institute lawnmower safety standards to establish whether lawnmower's condition was unreasonably dangerous); *Brown* v. *Cedar Rapids & Iowa City Railways Co.*, 650 F.2d 159, 163 (8th Cir. 1981) (noting trend in federal and state court to admit advisory safety codes promulgated by government agencies, as well as industry, voluntary, or private safety codes as evidence of standard of care); *Boston & Maine Railroad* v. *Talbert*, 360 F.2d 286, 290 (1st Cir. 1966) (evidence of nonauthoritative, nationally recognized standards concerning highway and railroad crossing design properly was admissible because it was "one more piece of evidence upon which the jury could decide whether the defendant acted as a reasonably prudent person in the circumstances of this case"); cf. *Landsiedel* v. *Buffalo Properties, LLC*, 112 P.3d 610, 616–17 (Wyo. 2005) (trial court did not abuse its discretion in refusing to instruct that nonapplicable building code or industry standards constituted minimum standard of care, but trial court did allow plaintiff to present evidence of code and standards); but see *Wise* v. *Tidal Construction Co.*, 270 Ga. App. 725, 729, 608 S.E.2d 11 (2004) (trial court did not improperly exclude evidence of inapplicable, national building codes to illustrate standard of care).

Some authorities take the contrary view to *Curtis* and do not allow such building codes to be considered as some evidence of the standard of care because they generally are concerned that a jury would likely misuse this evidence by treating any violation of such a code as negligence per se. See *Curtis* v. *District of Columbia*, supra, 363 F.2d 977–78 (Prettyman, J., dissenting) (concluding that evidence of regulation, which was inapplicable due to its adoption after construction of defendant's premises, should not be considered by jury because it would likely treat any violation of regulation as negligence per se, despite court's instruction to contrary); see also *Coleman* v. *Hall*, 161 N.W.2d 329, 330–31

(Iowa 1968) (determining that building code, which was not made retroactive, cannot be considered as standard of care with regard to building constructed before code's enactment because probative value of code was outweighed by risk that jury would be prejudiced by its admission); *Trimarco* v. *Klein,* 56 N.Y.2d 98, 108, 436 N.E.2d 502, 451 N.Y.S.2d 52 (1982) (concluding that it was improper to admit statute, which required land-lords to use certain type of glass in showers, because it risked prejudicing defendant and typical discretion to balance prejudice against relevancy was not applicable where other evidence of industry custom was available); *Ellis* v. *Caprice,* 96 N.J. Super. 539, 550–54, 233 A.2d 654 (App. Div.) (tenement statute regarding air shafts not admissible when prospective application only, thus not applicable to defendants' building; probative value outweighed by possibility of prejudice), cert. denied, 50 N.J. 409, 235 A.2d 901 (1967); cf. *Gubalke* v. *Estate of Anthes,* 189 Neb. 385, 389, 202 N.W.2d 836 (1972) (concluding that ordinance regulating construction of fences was not relevant evidence of standard of care because it was enacted after defendant's fence was constructed and not made retroactive). Nevertheless, this concern is not implicated in the present case because the trial court, sitting as the trier of fact, explicitly stated, in its memorandum of decision, that there was no supportable claim of negligence per se because the clubhouse was built after the effective date of the building code.[19] We therefore conclude that the trial court properly considered the building code and the

_____

[19] We note that a trial court presiding over a jury trial has wide discretion to exclude relevant evidence "if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury . . . ." Conn. Code Evid. § 4-3; see also *State* v. *Paulino,* 223 Conn. 461, 477, 613 A.2d 720 (1992) ("determination of whether the prejudicial impact of evidence outweighs its probative value is left to the sound discretion of the trial court judge" [internal quotation marks omitted]). In addition, if the trial court admits such evidence, it can mitigate the concern that the jury will misuse such evidence by issuing a proper limiting jury instruction.

federal regulations as *some* evidence of the standard
of care because they reflected the collective experience
and expertise of both the office of the state building
inspector and the federal Consumer Product Safety
Commission and what they believe to be the safe use
of glass in entryways.[20]

---

[20] The dissent argues that, by permitting the inapplicable building code
to be admitted as evidence of the standard of care, we are usurping the
role of the drafters of the building code by requiring the owners of otherwise
exempt premises to meet the standards set forth in the building code. We
believe that the dissent misconstrues the reach of today's decision.

First, our conclusion that the inapplicable building code properly was
considered as some evidence of the standard of care does not make owners
of exempt premises subject to the building code's provisions. For example,
the defendant, as the owner of the clubhouse, would not on the basis of
today's decision become subject to any fines or other sanction as a result
of using annealed glass in the clubhouse's entryway. See General Statutes
§ 29-254a ("[a]ny person who violates any provision of the State Building
Code shall be fined not less than two hundred nor more than one thousand
dollars or imprisoned not more than six months or both").

Second, we disagree with the dissent's view that our decision today signals
that an owner of exempt property will be held negligent for failing to remodel
his or her building to conform with otherwise inapplicable building code
standards. As we have stated previously herein, the defendant had a duty
"to reasonably inspect and maintain the premises in order to render them
reasonably safe." *Morin* v. *Bell Court Condominium Assn., Inc.*, supra, 223
Conn. 327. The question of what constitutes reasonable maintenance is
generally a fact intensive inquiry that will vary with the circumstances.
Accordingly, it certainly could be the case that it would be unreasonable
to require an exempt building owner to retrofit his or her building at great
expense to comply with the present building code where the risk of injury
from the existence of such a condition is proportionally not that great. See
*Conway* v. *O'Brien*, 111 F.2d 611, 612 (2d Cir. 1940) (Judge Learned Hand
noted three factors which determine standard of care owed in any given
circumstance: "the likelihood that [the person's] conduct will injure others,
taken with the seriousness of the injury if it happens, and *balanced against
the interest which he must sacrifice to avoid the risk*" [emphasis added]),
rev'd on other grounds by 312 U.S. 492, 61 S. Ct. 634, 85 L. Ed. 969 (1941);
*Congdon* v. *Norwich*, 37 Conn. 414, 419–20 (1870) (noting that trier of fact
should consider, in determining whether road was maintained in reasonably
safe condition, costs and feasibility of preventing hazardous condition, which
in this case was accumulation of snow and ice); *Washington* v. *Louisiana
Power & Light Co.*, 555 So. 2d 1350, 1351 (La. 1990) (affirming judgment
setting aside jury verdict because burden of taking necessary precautions
clearly outweighed magnitude of risk); *Williams* v. *New York Rapid Transit*

We note moreover that the plaintiff did not rely solely on references to the building code and federal regulations in establishing the standard of care. Rather, the plaintiff also offered Shanok's expert opinion that the defendant failed to maintain properly the entryway to the clubhouse. His opinion was based on the following factors. First, the use of annealed glass in an entryway area was hazardous because it breaks easily and is likely to cause serious injury when it does break. Second, the window panel's size, extending from the floor to the top of the adjoining door, its location in an entryway, a high traffic area, and its position next to a door, where it could be mistaken for part of the door, increased the risk of someone being seriously injured. Third, the defendant could have identified the hazard posed by this condition by inspecting its property. Finally, the defendant could have mitigated this hazard by installing tempered, thermally toughened, or laminated glass. We therefore conclude that the plaintiff proffered sufficient evidence to establish that the defendant, by failing to replace the glass in the sidelite, did not reasonably maintain the clubhouse in a reasonably safe condition.

## B

We turn next to the defendant's claim that the trial court improperly found that it was negligent because the plaintiff failed to present any evidence that it had actual or constructive notice of the sidelite's unsafe or

---

*Corp.*, 272 N.Y. 366, 369, 6 N.E.2d 58 (1936) (rejecting claim of negligence based on defendant's maintenance of train platform, in which only six feet of space allowed between newsstands and edge of platform, because "[i]f this form of construction is negligent, then hundreds, perhaps thousands, of railway stations must be rebuilt"); see also 3 F. Harper, F. James & O. Gray, supra, § 16.9, p. 478 ("if the risk is deemed reasonable in light of the disproportion of the cost to prevent it, it is thereby privileged in negligence law"). Thus, today's decision cannot be read as establishing a negligence per se rule for nonconformance with inapplicable building code provisions.

hazardous condition.[21] This court previously has stated that, in the context of a negligence action based on a defective condition on the defendant's premises, "[t]here could be no breach of the duty resting upon the defendants unless they knew of the defective condition or were chargeable with notice of it . . . ." *Cruz* v. *Drezek*, 175 Conn. 230, 235, 397 A.2d 1335 (1978). In the present case, the plaintiff does not claim that the defendant had actual notice of the defective condition, but contends instead that the defendant had constructive notice.[22] "The controlling question in deciding whether the defendants had constructive notice of the defective condition is whether the condition existed for such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to remedy it." Id., 238–39. "What constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances of a case." *Morris* v. *King Cole Stores, Inc.*, 132 Conn. 489, 494, 45 A.2d 710 (1946).

In the present case, Shanok testified, and the defendant did not contest, that the hazard posed by the use of nontoughened glass in the sidelite could have been identified if the defendant had engaged in the process of risk management, "which is simply the inspection of [its] premises to locate hazards and deal with them so

[21] The trial court did not make an explicit finding in its memorandum of decision that the defendant had actual or constructive notice of the defect that caused the plaintiff's injuries. Nevertheless, a finding of notice was implicit in the trial court's ultimate finding that the defendant was negligent in the maintenance of the sidelite. See *Giametti* v. *Inspections, Inc.*, 76 Conn. App. 352, 364, 824 A.2d 1 (2003) (despite lack of express finding of fact, implying from trial court's finding for plaintiff on merits of negligent misrepresentation claim that trial court found that plaintiff relied on misrepresentation because reliance is element of negligent misrepresentation).

[22] The defendant claims that it lacked notice because it had no knowledge of any problems with the sidelite and that no one had been injured by the sidelite in the previous twenty-six years. This claim addresses solely the question of whether the defendant had actual notice—an issue the plaintiff concedes to the defendant.

that you lessen the possibility of liability or accidents [on its] premises."[23] In addition, there was testimony

---

[23] The dissent contends that the plaintiff failed to establish constructive notice because he did not proffer evidence of how a reasonable inspection would have discovered that the glass in the sidelite was annealed glass. In particular, the dissent argues that because a visual inspection would not have revealed whether the glass was annealed glass or toughened glass and Geary testified that his review of the records and documents related to the clubhouse did not contain any information regarding the type of glass used in the sidelite, the plaintiff has failed to substantiate how a reasonable inspection would have discovered this defective condition.

We disagree with the conclusion reached by the dissent because it fails to consider the evidence in light of the standard of review that is applicable to the defendant's claim. As we have stated previously herein, "[w]e must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the [trier's] verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the [trier] could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." (Internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, supra, 262 Conn. 442. As we noted herein, Shanok testified that a landlord or building manager could have identified the defective condition posed by the sidelite through an inspection of the premises. Construing his testimony in the light most favorable to supporting the verdict, we believe that it supports a reasonable inference that a landlord or building manager could have identified the glass in the sidelite to not have been one of the toughened varieties of glass. Such an inference is further supported by the fact that the building was built before the building code and consumer product safety commission regulations required that toughened glass be used in entryways.

Further, the record contains no evidence to support the dissent's assertion that a visual inspection cannot distinguish between annealed and toughened glass. Nor do we believe that such a fact bears the hallmarks of accuracy and accessibility as to make it amenable to judicial notice. See *State* v. *Griffin*, 251 Conn. 671, 702–703, 741 A.2d 913 (1999) ("[f]acts may be judicially noticed which are so notorious that the production of evidence would be unnecessary, or which the judicial function supposes the judge to be familiar with, in theory at least, or which, although they are neither notorious nor bound to be judicially known, are capable of such instant and unquestionable demonstration, if desired, that no party would think of imposing a falsity on the tribunal in the face of an intelligent adversary" [internal quotation marks omitted]); *State* v. *Zayas*, 195 Conn. 611, 614, 490 A.2d 68 (1985) (judicial notice may be taken of "facts which are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy"). Indeed, the record would support an inference that visual inspection would reveal the distinction between these types of glass. Geary testified

that the clubhouse was built in approximately 1962, and that the state building code and the Consumer Product Safety Commission regulations were enacted in 1970 and 1980, respectively. Thus, the defendant had at least twenty-two years from the time when various authorities recognized that nontoughened glass should not be used in an entryway to inspect its property to identify the hazard posed by the sidelite and remedy it or warn its invitees of that hazard. Compare *McCrorey* v. *Heilpern*, 170 Conn. 220, 222, 365 A.2d 1057 (1976) (concluding that there was no reasonable basis for jury's finding of constructive notice because plaintiff proffered no evidence that defective condition existed for any period of time before plaintiff's injury), *White* v. *E & F Construction Co.*, 151 Conn. 110, 113–14, 193 A.2d 716 (1963) (evidence that defective condition existed for two minutes before accident was insufficient to charge defendant with constructive notice), and *Gulycz* v. *Stop & Shop Cos.*, 29 Conn. App. 519, 522, 615 A.2d 1087 (concluding that trier of fact could not find constructive notice because plaintiff offered no evidence that defect existed for any period of time), cert. denied, 224 Conn. 923, 618 A.2d 527 (1992), with *Kirby* v. *Zlotnick*, 160 Conn. 341, 345, 278 A.2d 822 (1971) (concluding that there was sufficient evidence of constructive notice where defective condition of porch railing, which caused plaintiff's injuries, existed for at least two weeks), and *Kurti* v. *Becker*, 54 Conn. App. 335, 339, 733 A.2d 916 (concluding that defendant had constructive notice of defect because three hours was sufficient

that, although he did not know the technical name for the glass, he described the glass in the sidelite as "regular" glass. Because Geary conceded that his review of the clubhouse's records did not reveal the type of glass used in the sidelite, his description of the glass as "regular" could only have been made on the basis of a visual inspection. Geary's testimony that the glass in the sidelite was "regular" glass, viewed in the light most favorable to supporting the verdict, reasonably would support an inference that he meant that the glass in the sidelite was not one of the varieties of toughened glass.

period of time for defendant to have discovered that ice formed on driveway and to have warned invitee or remedied situation), cert. denied, 251 Conn. 909, 739 A.2d 1248 (1999). Accordingly, we conclude that the plaintiff proffered sufficient evidence from which the trial court properly could have found that the defendant had constructive notice of the hazard posed by the use of annealed glass in the entryway of the clubhouse.

The judgment is affirmed.

In this opinion NORCOTT, KATZ and PALMER, Js., concurred.

ZARELLA, J., concurring in part and dissenting in part. Although I agree with the conclusion of the majority in part I of its opinion that governmental immunity does not shield the defendant, the city of Waterbury, from liability, two reasons compel me to dissent from the majority's conclusion in part II of its opinion that the plaintiff, Edward Considine, offered sufficient evidence to make out a prima facie case of negligence. First, the majority inappropriately affirms the use of an inapplicable building code as evidence of the standard of care owed by the defendant to the plaintiff. Second, even if it assumed that the use of the inapplicable building code as evidence of the standard of care was appropriate, the plaintiff failed to offer any evidence that the defendant had actual or constructive notice of any defect in the premises.

I

I generally agree with the facts set forth in the majority opinion and will not repeat them in this opinion. I disagree, however, with the majority's holding that the state building code is relevant evidence of the standard of care owed by the defendant to the plaintiff. I instead believe that a nonretroactive provision of a building code is not relevant evidence of the standard of care

owed to an invitee by the owner of exempted, preexisting premises.

Evidence is relevant if it has "any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1; see also *Jewett* v. *Jewett*, 265 Conn. 669, 679, 830 A.2d 193 (2003) ("[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue" [internal quotation marks omitted]). In the present case, the defendant owed the plaintiff "a duty . . . to reasonably inspect and maintain the premises in order to render them reasonably safe" and to "warn [the plaintiff] of dangers that [he] could not reasonably [have been] expected to discover." *Morin* v. *Bell Court Condominium Assn., Inc.*, 223 Conn. 323, 327, 612 A.2d 1197 (1992). The primary issue is whether "maintain[ing] the premises in order to render them reasonably safe"; id.; required the defendant to replace the annealed glass of the sidelite with a safer type of glass.

The plaintiff introduced evidence that the state building code forbids the use of annealed glass in entryway sidelites in new construction. A necessary premise for deeming this evidence relevant to the issue of whether the defendant had a duty to replace the glass is that the state building code represents an official declaration of what is, and what is not, reasonably safe. Cf. *Curtis* v. *District of Columbia*, 363 F.2d 973, 977–78 (D.C. Cir. 1966) (Prettyman, J., dissenting). This premise, however, does not exist in the present case. As the plaintiff's expert, Michael E. Shanok, testified at trial, the state building code sets forth two distinct safety standards, one that is applicable to regulated premises and one that is applicable to exempted premises, such as the

premises at issue in this case.[1] By holding that the state building code's prohibition on the use of annealed glass in new construction is relevant evidence of what is, and what is not, "reasonably safe," the majority unwarrantedly cherry-picks the standard that *does not* apply to the defendant's premises to the exclusion of the standard that *does* apply to the defendant's premises. It seems that it is more likely that the drafters of the state building code determined that preexisting uses of annealed glass in entryways were *not* so dangerous as to necessitate remediation and, accordingly, approved those uses of annealed glass by exempting them from regulation.[2] The fact that the state building code prohibits the use of annealed glass in entryway sidelites in new construction does not reflect any definitive judgment as to what is, and what is not, reasonably safe. Evidence of the state building code therefore does not make it more or less probable that the defendant was required to replace the glass to render its premises reasonably safe, and is thus irrelevant.[3]

Moreover, even if the building code's prohibition on the use of annealed glass in an entryway were relevant,

[1] The former standard requires owners of regulated premises to refrain from using annealed glass in entryway sidelites whereas the latter standard does not require any particular improvement to exempted premises.

[2] The majority, after reciting the qualifications of the professionals responsible for adopting and administering the state building code, asserts that "the building code reflects the reasoned judgment of numerous professionals with extensive relevant experience that in the interests of safety the use of annealed glass in the entryway of buildings should be prohibited in future construction." Footnote 18 of the majority opinion.

I agree with the majority that those persons responsible for adopting and administering the state building code are experts. The majority, however, fails to appreciate that the building code also reflects the reasoned judgment of numerous professionals with extensive relevant experience that the use of annealed glass in preexisting building entryways is *not so unsafe* as to necessitate remediation.

[3] If anything, evidence of the inapplicable state building code is relevant to show that the defendant did not act unreasonably in failing to replace the entryway's annealed glass.

any probative value it may have is outweighed by the danger of unfair prejudice or confusion, or of misleading the jury. See Conn. Code Evid. § 4-3 ("[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury"). The admission of evidence of an inapplicable statutory standard of care creates a virtual certainty of jury confusion in light of the nebulous distinction between supposedly permissible use of the statute as evidence of the standard of care and supposedly impermissible use of the statute as evidence of negligence. As Judge Prettyman opined in his dissent in *Curtis* v. *District of Columbia*, supra, 363 F.2d 973, "[o]nce the regulation is in evidence, a jury would almost inevitably give it effect. Indeed I am not quite sure myself what the line is between giving effect to the regulation and considering it as evidence of negligence." Id., 978 (Prettyman, J., dissenting); see also *Ellis* v. *Caprice*, 96 N.J. Super. 539, 553, 233 A.2d 654 (App. Div.) (any probative value of evidence of statute purportedly establishing standard of conduct was outweighed by possibility of prejudice), cert. denied, 50 N.J. 409, 235 A.2d 901 (1967); *Trimarco* v. *Klein*, 56 N.Y.2d 98, 108, 436 N.E.2d 502, 451 N.Y.S.2d 52 (1982) ("it cannot be said that [nonretroactive] statutes, once injected into the adversarial conflict, did not prejudice the defendants"). This likelihood of confusion underlies Professor Wigmore's opposition to the use of statutory standards in any context other than those involving the rule of negligence per se. 2 J. Wigmore, Evidence (Chadbourn Rev. Ed. 1979) § 461, pp. 606–607. For this additional reason, the trial court's consideration of evidence of the state building code was improper.

Finally, policy considerations militate against the admission of this evidence. The drafters of the state building code expressly exempted certain premises,

including the premises at issue in the present case, from regulation. The law, however, requires a person not to do that which is negligent—including, apparently, failing to replace exempted uses of annealed glass in entryway sidelites. See *Curtis* v. *District of Columbia*, supra, 363 F.2d 978 (Prettyman, J., dissenting). Thus, in permitting the state building code to inform a property owner's standard of care, the majority effectively expands the regulatory force of the code far beyond what its drafters intended.[4] The majority makes much of its distinction between using the building code as a substantive standard and using it as evidence of the standard of care. This distinction, however, is cold comfort to the owner of an exempted premises who nonetheless will be required either "to reconstruct and remodel his building to meet changing safety standards" on an ongoing basis or to take his chances with a jury.[5] *Coleman* v. *Hall*, 161 N.W.2d 329, 331 (Iowa 1968); see also *Curtis* v. *District of Columbia*, supra, 977–78 (Prettyman, J., dissenting). The majority's usurpation of the function of the drafters of the state building code to promulgate rules for the construction and use of buildings is another reason to preclude evidence of an inapplicable building code from informing an exempted property owner's standard of care.

My position is supported by this court's decision in *Dinnan* v. *Jozwiakowski*, 156 Conn. 432, 242 A.2d 747

---

[4] This rationale is particularly persuasive when an inapplicable building code is the *only* evidence of the standard of care. Although the majority, in stating that "the trial court properly considered the building code and the federal regulations as some evidence of the standard of care," implies that additional evidence of the standard of care will be offered beyond the inapplicable building code, it is unclear whether the majority would *require* evidence of the standard of care in addition to the evidence of the inapplicable building code.

[5] The majority disagrees that its decision "signals that an owner of exempt property will be held negligent for failing to remodel his or her building to conform with otherwise inapplicable building code standards." Footnote 20 of the majority opinion. This, however, is precisely what has happened in the present case as a consequence of the majority's decision.

(1968). The majority states that, in that case, this court "did not reject the trial court's instruction that [an inapplicable] building code could be considered in evaluating expert testimony regarding the standard of care" and that "*Dinnan* precludes a jury instruction that a technically inapplicable building code must be considered as *the* standard of care, or, stated another way, a violation of this building code would not have constituted negligence per se." (Emphasis in original.) These statements, although accurate, are nonetheless misleading because the issues of whether an inapplicable building code may be considered in impeaching expert testimony and whether an inapplicable building code can support a negligence per se instruction were not contested in *Dinnan* and are not contested in the present case. I interpret *Dinnan* to stand for the more pertinent proposition that, although evidence of an inapplicable building code may be used to impeach a witness, it may not be used for the substantive standards that the code establishes. This *was* the issue that this court decided in *Dinnan.*

In *Dinnan,* a tenant was injured when she fell down the staircase of a building owned by the defendant, Stanislawa Jozwiakowski. Id., 433. The staircase appeared to be in compliance with the local building code. See *Dinnan* v. *Jozwiakowski,* Conn. Supreme Court Records & Briefs, April Term, 1968, Pt. A-479, Record pp. 15, 17. The staircase nevertheless was exempt from the code because it had been constructed prior to the code's enactment. See *Dinnan* v. *Jozwiakowski,* supra, 156 Conn. 436. At trial, Henry J. Falsey, a former local building inspector, testified for the tenant that the staircase was not reasonably safe. *Dinnan* v. *Jozwiakowski,* Conn. Supreme Court Records & Briefs, supra, Appendix to Plaintiff's Brief p. 6a. On cross-examination, the building owner introduced testimony regarding the local building code—which Falsey him-

self had been "primarily responsible for preparing"—in an apparent attempt to impeach Falsey's testimony that the staircase was not reasonably safe. Id., Appendix to Defendant's Brief p. 4a. The trial court instructed the jury that the testimony regarding the local building code was admitted "for the purpose of testing the soundness of the opinions given by [Falsey]." Id., Record p. 29. The trial court made it clear, however, that no party was claiming "that there [was] any violation of the building code in [the] case because it seem[ed] to be undisputed that the code was enacted sometime after [the] building was erected." Id.

On appeal, the building owner argued that the jury should have been instructed to consider the inapplicable local building code not only for impeachment purposes but also for the standards it established, presumably because the building owner believed that her compliance with the code, at least with respect to the staircase at issue, would support her case. Id., Defendant's Brief pp. 6–7 ("[T]he [c]ode must be considered with respect to the standards of safety it sets up. . . . [T]he jury should have been charged on its consideration of the standards established in the [c]ode."). This court rejected the building owner's argument, however, reasoning that "[t]here was no claim of any violation of the building code since it was enacted after the building was erected. Under the circumstances, the [building owner] certainly ha[d] no ground to complain of the court's charge that the evidence as introduced in this connection was for the purpose of testing the soundness of the opinions given by the experts." (Internal quotation marks omitted.) *Dinnan* v. *Jozwiakowski*, supra, 156 Conn. 436. The rule established in *Dinnan* is both clear and directly pertinent to the present case: Although an inapplicable building code may be used to impeach a witness, it may not be used for the substantive standards it establishes, even when the

proponent seeks to establish that his or her premises are in compliance with the inapplicable code.

## II

Even if an inapplicable building code is admissible as evidence of the defendant's standard of care, the plaintiff still failed to meet his burden of demonstrating the defendant's negligence insofar as he failed to offer any evidence that the defendant had notice of any defect in the premises.[6]

A plaintiff bears the burden of proving the allegations in his or her complaint. E.g., *Rivera* v. *Meriden*, 72 Conn. App. 766, 769, 806 A.2d 585 (2002). In the present case, the plaintiff's burden includes making out a prima facie case of the defendant's negligence. A prima facie case of negligence consists of four elements: duty; breach; causation; and injury. E.g., *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 687 n.13, 849 A.2d 813 (2004). There can be no breach, however, unless the defendant "had actual knowledge of the defect [in the premises] or . . . [was] chargeable with constructive notice of it, because, had [the defendant] exercised a reasonable inspection of the premises, [it] would have discovered [the defect]." *Pollack* v. *Gampel*, 163 Conn. 462, 468, 313 A.2d 73 (1972).

The majority opinion rests on the premise that the mere presence of annealed glass in the entryway sidelite was an unsafe defect requiring replacement or warning. The plaintiff, however, has failed to demonstrate the defendant's constructive notice that the sidelite was composed of annealed glass insofar as he has failed to offer evidence "from which the jury reasonably could have concluded that a reasonable inspection would

---

[6] The plaintiff does not claim that the defendant had actual notice that the sidelite was composed of annealed glass. He only claims that the defendant had constructive notice thereof.

have disclosed the [fact that the sidelite was composed of annealed glass]." Id., 470.

Shanok testified—and the majority apparently agrees—that the hazard posed by the use of annealed glass in the sidelite could have been discovered if the defendant had engaged in the process of risk management, "which is simply the inspection of premises to locate hazards and deal with them so that you lessen the possibility of liability or accidents . . . ." The logic of this position under the circumstances of the present case is untenable. Annealed glass is indistinguishable from safety glass in appearance, and the plaintiff offered no evidence that the pane through which he fell was etched or otherwise marked as annealed glass.[7] See,

---

[7] The majority states that "the record contains no evidence to support [my] assertion that a visual inspection cannot distinguish between annealed and toughened glass." Footnote 23 of the majority opinion. The majority, however, fails to appreciate that the record contains no evidence to support the assertion that a visual inspection—or, indeed, any reasonable inspection—*can distinguish* between annealed and toughened glass. In so doing, the majority misplaces the burden of proof. It was incumbent on the plaintiff *to demonstrate that reasonable inspection of the defendant's premises would* have put the defendant on notice of the presence of annealed glass in the entryway. The plaintiff has not met this burden.

Moreover, even though the standard of review requires us to view the evidence in the light most favorable to sustaining the verdict, drawing reasonable inferences therefrom, it can hardly be said that any reasonable inference can be drawn from Shanok's conclusory opinion testimony, which was not grounded in facts and did not contain any reasons in support of his opinion.

Finally, the majority's assertion that "the record would support an inference that visual inspection would reveal the distinction between [annealed and safety] glass" is disingenuous. Id. Although it is true that Joseph A. Geary, the defendant's deputy director of public works, testified that the glass appeared to be "regular" glass, he also testified that he "[did not] know, you know, the technical version of what type of glass was in that door . . . ." Moreover, Geary testified that the pieces of glass he observed upon arriving at the scene the night of the accident were "smaller pieces of glass" and that the broken glass "appeared to be in smaller pieces than when safety glass would break." Geary testified after Shanok had testified that annealed glass "has a [tendency] to break in large shards," while safety glass "would break into small cubes . . . ." The majority, in attempting to use Geary's testimony to support an inference regarding the type of glass

e.g., *Becker* v. *IRM Corp.*, 38 Cal. 3d 454, 469, 698 P.2d 116, 213 Cal. Rptr. 213 (1985) ("the undisputed affidavits are to the effect that there was 'no visible difference between the tempered and untempered glass in terms of visible appearance' "); *Trimarco* v. *Klein*, supra, 56 N.Y.2d 102 ("the [glass] door [of a bathtub that shattered], which turned out to have been made of ordinary glass variously estimated as one sixteenth to one quarter of an inch in thickness, *concededly would have presented no different appearance to the plaintiff . . . than did tempered safety glass*" [emphasis added]). Indeed, the plaintiff himself testified that "[i]t didn't appear that there was anything wrong with the glass" of the sidelite before he fell into it. Moreover, Joseph A. Geary, the defendant's deputy director of public works, testified that the documents and records available to him did not indicate what type of glass was used in the entryway sidelite.[8] In the absence of any indication of the type of glass used in the pane, an inspector would have had to shatter the pane in order to determine whether it was composed of annealed glass. This simply is not a reasonable inspection to require a property owner to perform. See *Fitzgerald* v. *Cestari*, 569 So. 2d 1258, 1260 (Fla. 1990) ("the dangerous condition, in this case a lack of safety glass [in a sliding door], was not discoverable through a reasonable inspection by the owners"). But cf. *Becker* v. *IRM Corp.*, supra, 469 (reversing judgment in favor of defendant because jury could have found that reasonable visual inspection by defendant would have disclosed that injury causing glass was marked "untempered"). Because the plaintiff has offered no evidence to demonstrate how a reasonable inspection would have put the defendant on notice of the presence of annealed glass on its premises, I

in the entryway, once again cherry-picks isolated fragments of Geary's testimony without regard to the full extent of his testimony.

[8] Geary also testified that the glass had not been broken, repaired or replaced since the clubhouse's construction in 1962.

must conclude that the plaintiff has failed to meet his burden of proving the allegations contained in his complaint.

I respectfully dissent and would reverse the judgment of the trial court.